**IN THE UNITED STATES COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| NAPCO, INC., a North Carolina corporation, | |
| *Plaintiff,* | **Case No.:** 1:21-cv-00025 |
| v. | |
| LANDMARK TECHNOLOGY A, LLC, a North Carolina limited liability company, | |
| *Defendant* | |

## COMPLAINT

NAPCO, Inc. ("NAPCO") files this Complaint against Defendant Landmark Technology A, LLC ("Landmark") and hereby alleges, on knowledge of its own actions and on information and belief as to all other matters, as follows:

### I.     INTRODUCTION

1.     This case involves unlawful attempts by Landmark to extract and extort a baseless and unreasonable "license fee" from NAPCO for alleged patent infringement of United States Patent No. 7,010,508 ("the '508 Patent").

2.     NAPCO brings this action seeking: (1) a declaration under the Declaratory Judgment Act (28 U.S.C. § 2201) that NAPCO (or any of its affiliated companies or websites) has not infringed and does not infringe any valid and enforceable claim of the '508 Patent; and (2) the entry of appropriate injunctive relief and the recovery of damages (including costs of suit and attorneys' fees) resulting from Landmark's unlawful and

1

abusive conduct in violation of the North Carolina Abusive Patent Assertion Act (N.C. Gen. Stat. §§ 75-140, *et seq.*), and other applicable law

## II.     PARTIES

3.     Plaintiff NAPCO, Inc. is a North Carolina corporation with its principal place of business at 120 Trojan Ave, Sparta, North Carolina.  NAPCO is the owner of the website www.binders.com (the "website").  NAPCO's wholly-owned subsidiary Vulcan Information Packaging ("Vulcan") operates the website and no NAPCO products or services are offered on the website.  Typically, Vulcan derives less than three percent (3%) of its annual revenue from sales made on or through the website.  For purposes of this Complaint, references to the term "NAPCO" include NAPCO, Inc., its subsidiary Vulcan, and the website.

4.     NAPCO is, and at all times relevant to this Complaint, and was a "target" as that term is used and defined in North Carolina's Abusive Patent Assertion Act (N.C. Gen. Stat. §§ 75-140, *et seq.*) (the "APAA") in that, as set forth below, it is a North Carolina company that (1) "received a demand [from Landmark] or is the subject of an assertion or allegation of patent infringement" by Landmark and (2) "has been threatened," by Landmark, "with litigation" relating to alleged patent infringement.  *See* N.C. Gen. Stat. § 75-142(6)(a)-(b).

5.     On information and belief, Defendant Landmark is a limited liability company organized under the laws of the State of North Carolina with its principal place of business at 2530 Meridian Pkwy Ste 300, Durham, North Carolina.

6.     According to annual reports filed by Landmark in 2019 and 2020 with the North Carolina Secretary of State, Landmark's business is "Patent Licensing."

7.     Upon information and belief, Landmark is not, and at all time relevant to this Complaint, was not an "operating entity" as that term is used and defined in the APAA in that, when "disregarding the selling and licensing of patents," Landmark is not primarily engaged in (1) "[r]esearch and technical or experimental work to create, test, qualify, modify, or validate technologies or processes for commercialization of goods and services," (2) manufacturing, or (3) the provision of goods or commercial services.  *See* N.C. Gen. Stat. § 75-142(5)(a)-(c).

## III.     JURISDICTION AND VENUE

8.     The Court has original and exclusive subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this Complaint states claims arising under an Act of Congress relating to patents, to wit, 35 U.S.C. § 271.

9.     The Court also has original and exclusive subject matter jurisdiction over these claims because this Complaint arises under the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201 and 2202), in that it involves an actual case or controversy due to Landmark's affirmative act of making meritless accusations of alleged patent infringement by NAPCO's in connection with NAPCO's ongoing business and Landmark's pattern of engaging in actual litigation concerning the '508 Patent.

10.     The Court has supplemental jurisdiction over NAPCO's claim under North Carolina's Abusive Patent Assertion Act (N.C. Gen. Stat. §§ 75-140, *et seq.*) pursuant to

3

28 U.S.C. § 1367(a) because, as set forth below, the APAA claim is so related to the claim(s) over which the Court has original jurisdiction that the claims form part of the same case or controversy under Article III of the United States Constitution.

11.     Landmark and its related companies have a well-documented history of sending demand letters accusing companies of infringing Landmark's rights regarding the '508 Patent and related patents, offering to provide the alleged infringers a non-exclusive license to use the patent(s) at issue for a fee and suing these companies if they do not pay Landmark for a license to use the subject patent(s).[1]

12.     NAPCO received such a demand letter from Landmark in October 2020. A copy of the Landmark's October 16, 2020 demand letter (the "Demand Letter") is attached as *Exhibit A* to this Complaint and is incorporated herein by this reference.

13.     This Court has personal jurisdiction over Landmark because Landmark is organized under the laws of the State of North Carolina and claims in filed annual reports that its principal place of business is in the Middle District of North Carolina.

14.     Furthermore, upon information and belief, Landmark conducts substantial business in North Carolina, including regularly doing or soliciting business, and engaging in other persistent courses of conduct.

15.     Upon information and belief, Landmark has purposefully and repeatedly directed its activities at residents of North Carolina, including sending letters to numerous

---

[1] Upon information and belief, Landmark and its related companies have been involved in over 100 lawsuits in which Landmark alleges patent infringement. And, Landmark has filed at least 80 lawsuits related to alleged infringement of the '508 Patent since September 2008.

other companies based in North Carolina, asserting infringement of the '508 Patent and demanding payment of money.

16.     Pursuant to 28 U.S.C. §§ 1391(b), 1391(c), 1391(d), and 1400(b), venue is proper in the Middle District of North Carolina, as Landmark's principal place of business is listed as Durham, North Carolina and a substantial part of the events giving rise to the claims in the Complaint occurred in this judicial district.

## IV.     FACTUAL BACKGROUND

**A.     General Background**

17.     Upon information and belief, Landmark does not make, use, or sell any product or services of its own, but is solely involved in the business of patent licensing through the threat of litigation.  Thus, Landmark is an entity commonly referred to as a "patent troll."

18.     On information and belief, Landmark's sole business model and activity involves sending letters accusing others of patent infringement and threatening litigation.

19.     On information and belief, Landmark implies that it is the exclusive licensee of the '508 Patent with the right to enforce the '508 Patent. Landmark, by its own admission, files patent infringement lawsuits against companies that refuse to pay the license fee sought by way of Landmark's licensing demand letters. At one point in time, Landmark filed patent infringement actions against numerous large, nationally recognized companies. *See Landmark Technology, LLC v. Zale Corp., et al.*, 2009 WL 3147108 (E.D. Tex. 2009) (which included as defendants: Blue Nile, Inc., Canon USA,

5

Inc., Eddie Bauer, Inc., Kohl's Corp., Lowe's Companies, Inc., Walgreen Co., Golfsmith International Holdings, Inc. and Bidz.com, Inc.); _Landmark Technology LLC v. BlockBuster Inc., et al._, No. 6:10-cv-00302 (E.D. Tex. 2010) (which included as defendants: Casio America, Inc. CVS Caremark Corp. Dillard's Inc. Radioshack Corp. The Men's Warehouse Inc. Tiffany & Co., Urban Outfitters, Inc.).

20.     Upon information and belief, large, nationally recognized defendants have the budget to not only defend against such frivolous actions in court, but also to file administrative procedures to invalidate the claims of the '508 patent.

21.     For instance, in 2012, a Request for _Ex Parte_ Reexamination proceeding (the "EPX") was filed seeking to invalidate all of the claims of the '508 patent.  In fact, the EPX invalidated one of the three independent claims and only allowed the remaining two independent claims because the USPTO interpreted the remaining claims in an extremely narrow manner.  _See_ EPX File History, June 6, 2017, Notice of Intent to Issue a Rexam Certificate - Appendix.

22.     In addition to the _ex parte_ reexamination proceeding, eBay instituted a Covered Business Method Review ("CBMR") at the United States Patent and Trademark Office ("USPTO").  Upon review of the CBMR application, the USPTO decided to institute the CBMR and concluded its decision with:

> **Because we have determined that the claims are, more likely than not, indefinite, we are unable to determine the scope of the claims of the '508 patent**, and thus are unable to determine the differences between the claimed invention and the prior art. We are therefore unable to consider EEI's proposed grounds of unpatentability based on § 103 . . . .

For the reasons given, it is ORDERED that the Petition is granted as to claims 1-17 of the '508 patent, and *a covered-business-method patent review is hereby instituted as to claims 1-17 of the '508 patent on the alleged ground that they are unpatentable as indefinite under 35 U.S.C. § 112 ¶ 2.*

*eBay Enterprise Inc. v. Lawrence Lockwood,* CBM2014-00025, Paper 24 at 24 (PTAB May 20, 2014) (emphasis added).

23.     Rather than defending the claims of the '508 patent against the invalidity assertions from eBay and the USPTO, Landmark settled with eBay causing the termination of the CBMR.

24.     Upon information and belief, rather than risk invalidation of the other claims in the '508 patent, in recent years Landmark has focused its patent enforcement efforts exclusively on smaller companies who may not have the financial resources to file invalidation actions such as CMBRs.[2]  *See, e.g., Beauty Industry Group Opco v. Landmark Technology A.*, No. 2:20-cv-00590 (D. Utah 2020); *Landmark Technology A, LLC v. Art of Beauty Company, Inc.*, No. 1:20-cv-01637 (N.D. Ohio 2020); *Landmark Technology A LLC v. Stoneway Electric Supply Co.*, No. 2:20-cv-00974 (W.D. Wash. 2020); *Landmark Technology A, LLC v. Mailender, Inc.*, No. 1:20-cv-00479 (S.D. Ohio 2020); *Fink's Jewelers, Inc. v. Landmark Technology A, LLC.*, No. 7:20-cv-00336 (W.D. Va. 2020); *Landmark Technology A LLC v. Tom Bihn Inc.*, No. 2:20-cv-00328 (W.D.

---

[2] The CMBR program ended in September of 2020 and is no longer available as an administrative route to invalidate patents. *See Transitional Program for Covered Business Method Patents,* USPTO website, https://www.uspto.gov/patents-application-process/patent-trial-and-appeal-board/trials/transitional-program-covered-business-method (last modified Sept. 4, 2020).

Wash. 2020); *Landmark Technology A, LLC v. Sterling Paper Co.*, No. 2:20-cv-00769 (S.D. Ohio 2020); *Landmark Technology A, LLC v. Frost Electric Supply Company*, No. 4:19-cv-03307 (E.D. Mo. 2020); *V. Sattui Winery v. Landmark Technology A, LLC.*, No. 3:19-cv-05207 (N.D. Calif. 2020); *Landmark Technology A, LLC v. Amerimark Direct LLC.*, No. 1:19-cv-01077 (S.D. Ohio 2019); *Landmark Technology A, LLC v. The Miami Corporation*, No. 1:19-cv-00653 (S.D. Ohio 2019); *Landmark Technology A LLC v. The Essential Baking Company Inc.*, No. 2:19-cv-01208 (W.D. Wash. 2019); *Mazzio's, LLC v. Landmark Technology A, LLC.*, No. 4:19-cv-00299 (N.D. Okla. 2019); *Landmark Technology A, LLC v. Woodland Foods, Ltd.*, No. 1:19-cv-02577 (N.D. Ill. 2019); *Landmark Technology A LLC v. Specialty Bottle Inc et al.*, No. 2:19-cv-00311 (W.D. Wash. 2019); *Landmark Technology A, LLC v. U.S. SafetyGear, Inc.*, No. 4:19-cv-00270 (N.D. Ohio 2019); *Landmark Technology, LLC v. Kanan Enterprises, Inc.*, No. 1:18-cv-02339 (N.D. Ohio 2018); *Landmark Technology, LLC v. Thrift Books LLC et al.*, No. 2:18-cv-01395 (W.D. Wash. 2018); *Landmark Technology, LLC v. A.M. Leonard, Inc.*, No. 3:18-cv-00306 (S.D. Ohio 2018); *Landmark Technology, LLC v. Azure Farms, Inc.*, No. 3:18-cv-01568 (D. Or. 2018); *Landmark Technology LLC v. Gensco, Inc.*, No. 3:17-cv-015872 (W.D. Wash. 2017); *Landmark Technology LLC v. Anthony-Thomas Candy Co.*, No. :17-cv-00908 (S.D. Ohio 2017); *Landmark Technology LLC v. Totally Chocolate, LLC*, No. 2:17-cv-01396 (W.D. Wash. 2017); *Landmark Technology LLC v. Southern Motorcycle Supply, Inc.*, No. 3:17-cv-01836 (S.D. Cal. 2017); *World Pantry.com, Inc. v. Landmark Technology LLC*, 3:17-cv-04837 (N.D. Cal. 2017); *Paint Sundry Solutions, Inc. v. Landmark Technology LLC*, 2:17-cv-01073 (W.D. Wash. 2017);

8

*Landmark Technology LLC v. Jones Soda Co.*, No. 2:17-cv-00978 (W.D. Wash. 2017);

*Landmark Technology LLC v. Launchpad, Inc.*, No. 3:17-cv-00892 (S.D. Cal. 2017);

*Antennas Direct v. Landmark Technology LLC,*4:17-cv-01399 (E.D. Mo. 2017);

*Landmark Technology LLC v. GourmetGiftBaskets.com*, No. 3:17-cv-00851 (S.D. Cal.

2017); *Build A Sign, LLC v. Landmark Technology LLC*, No. 1:17-cv-00227 (W.D. Tex.

2017); *Collin Street Bakery v. Landmark Technology LLC*, 3:17-cv-00256 (N.D. Tex.

2017); *Fabletics, LLC v Landmark Technology LLC,* No. 3:17-cv-000 (N.D. Cal. 2017);

*Triad Catalog Co. L.L.C. v. Landmark Technology LLC,* No. 4:16-cv-01690 (E.D. Mo.

2016); *Tatcha, LLC v. Landmark Technology LLC,* No. 3:17-cv-04831 (N.D. Cal 2016);

*Landmark , LLC v. G. Stage Love.com Inc.,* No. 3:16-cv-00760 (S.D. Cal. 2016);

*Landmark, LLC v. Canada Drugs L.P.,* No 3:16-cv-00558 (S.D. Cal. 2016); *Adore Me,*

*Inc. v. Landmark Technology LLC,* No. 1:15-cv-09800 (S.D.N.Y. 2015); *LGS Yoox Corp.*

*v. Landmark Technology LLC,* No. 1:15-cv-03893 (S.D.N.Y. 2015); *Landmark*

*Technology, LLC v. Ace US Holdings, Inc., Ace Limited and Ace USA, Inc.,* No. 6:15-cv-

00437 (E.D. Tex. 2015); *Landmark Technology, LLC v. Assurant, Inc.,* No. 6:15-cv-

00076 (E.D. Tex. 2015); *Landmark Technology, LLC v. Ace Limited and Ace USA, Inc.,*

No. 6:15-cv-00437 (E.D. Tex. 2015); *Landmark Technology, LLC v. YOOX Corp.,* No.

6:15-cv-00069 (E.D. Tex. 2015); *Landmark Technology, LLC v. The Michaels*

*Companies, Inc.,* No. 6:15-cv-00068 (E.D. Tex. 2015); *Landmark Technology, LLC v.*

*Ace INA Holdings, Inc.,* No. 6:15-cv-00067 (E.D. Tex. 2015); *Landmark Technology,*

*LLC v. Zillow, Inc.,* No. 6:15-cv-00004 (E.D. Tex. 2015).

9

25.     Upon information and belief, Landmark has filed over 70 lawsuits against various smaller companies asserting claims based on the '508 Patent and/or its related patents.

26.     Upon information and belief, none of the numerous lawsuits involving Landmark's attempts to enforce the '508 Patent and its related patents have made it as far as claim construction. In fact, few defendants have answered the complaints filed by Landmark in such cases. The remaining cases appear to have been resolved prior to the answer filing deadline or soon after.

27.     Landmark also appears to systematically settle litigation prior to any potentially damaging rulings on the baselessness of Landmark's claims, thereby preserving its ability to extract license fees from other small companies in the future.

28.     Upon information and belief, Landmark quickly and confidentially settles these suits to prevent future targets from learning of the baselessness of its claims.

29.     District courts may award fees where "a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless" exceptional.  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).  Numerous authorities have found that in circumstances similar to those presented here – where a party's business model involves filing several patent infringement suits and leveraging the cost of litigation to extract settlements, and with no intention of testing the merits of its claims – are "exceptional," so as to support the award of fees and costs under the standard articulated in *Octane Fitness*. *See SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350 (Fed. Cir. 2015) (finding that a pattern of litigation abuses characterized by the repeated

filing of patent infringement actions for the sole purpose of forcing settlements, with no intention of testing the merits of one's claims, is relevant to a district court's exceptional case determination under 35 U.S.C. § 285); *Rothchild Connected Devices Innovation, LLC v. Guardian Prot. Servs., Inc.*, 858 F.3d 1383, 1388 (Fed. Cir. 2017) (finding reversible error in district court's failure to consider, in its determination whether to award fees under 35 U.S.C. § 285, the patent owners' pattern of litigation practices and willful ignorance of invalidating circumstances); *Shipping and Transit LLC v. Hall Enterprises, Inc.*, No. 2:16-cv-06535, *8 (C.D. Cal. 2017) (finding that a pattern of filing serial litigation and voluntarily dismissing cases prior to judgment on validity justified the award of attorney fees under 35 U.S.C. § 285).

**B.     Landmark's Demand to NAPCO**

30.     Landmark has accused NAPCO of infringing the '508 Patent and has demanded payment of $65,000 without providing the name and address of the patent holder.  *See id.*

31.     Landmark demanded payment of $65,000 through deceptive and misleading information regarding the importance of the '508 Patent as a "pioneer patent." *See id.*

32.     The Demand Letter does not include an element by element claim analysis, or any other type of detailed analysis or description of the NAPCO services it alleges infringes the '508 Patent, but simply makes general statements regarding NAPCO's web servers.

33.    For example, the Demand Letter states that "the specific functionalities implemented by NAPCO using their servers and devices interfaced to NAPCO's web servers constitutes use of the technology taught within the meaning of Claim 1 of the '508 Patent." *See* Ex. A (Demand Letter) at 2.

34.    Prior to sending the demand, Landmark either (1) failed to conduct an analysis comparing the claims as reasonably construed in the '508 Patent to NAPCO's products, services, and technology, and/or (2) knew, and should have known, that the claims as reasonably construed could not possibly cover NAPCO's products, services, and technology.

35.    Each of these actions by Landmark constitute bad faith assertions of patent infringement under the APAA (N.C. Gen. Stat. §§ 75-140, *et seq.*), including, but not limited to § 75-143(a)(1)-(12).

36.    Landmark's Demand Letter concludes by offering NAPCO the option to pay $65,000 for a non-exclusive license to Landmark's patent portfolio, including the '508 Patent, or be sued by Landmark.  *See* Ex. A (Demand Letter) at 1.

37.    Landmark further notes that the license offer "will not be available in the event of litigation" and gives NAPCO 15 days within which to respond. *See id.* at 2. Nowhere in the Demand Letter does Landmark indicate that its offer is negotiable.

38.    Upon information and belief, this tactic is designed to extract payment from letter recipients, knowing that the payment would be significantly less expensive than defending against even a very questionable patent case in court.

C.     The '508 Patent

39.     The '508 Patent, entitled "Automated Business and Financial Transaction Processing System," was issued on or about March 7, 2006.  The named inventor and presumed owner of the '508 Patent is Lawrence B. Lockwood ("Lockwood").  A copy of the '508 Patent is attached as **Exhibit B** and is incorporated herein by this reference.

40.     The '508 Patent originally issued with three independent patent claims (Claims 1, 8, and 16). *See* Ex. B ('508 Patent), Col. 6, ln. 35 to Col. 7, ln. 30; Col. 7, lns. 47-59; Col. 8, lns. 24-55. [3]

41.     The invention relates to terminals used by banking and other financial institutions to make their services available at all hours of the day from various remote locations. *See id.*, Col. 1, lns. 22-25.

42.     In fact, as the Patent Specification states: "*The principal object of this invention is to provide an economical means for screening loan applications.*" *See id.*, Col. 1, lns. 47-48 (emphasis added).

43.     Other objects of the invention include: "a system that ties together financial institution data processing, the computer services of a credit reporting bureau, and a plurality of remote terminals.  *Each remote terminal displays the live image of a fictitious loan officer who helps the applicant through an interactive series of questions and answers* designed to solicit from the applicant all the information necessary to process his loan application." *See id.,* Col. 1, ln. 64- Col. 2, ln 4 (emphasis added).

---

[3] The USPTO later held that independent claim 8 and its dependent claims 9 through 15 were invalid. *See Ex Parte* Reexamination Certificate US7,010,508 C1, June 29, 2017.

13

**D.     The '508 Patent's Prosecution History**

44.     The prosecution of the patent family of the '508 Patent lasted for decades. Lockwood, the patent "Applicant," filed his first patent application in 1984.

45.     In 1986 he filed a continuation-in-part or "CIP" patent application which, in essence, continued and amended his first patent application.

46.     This CIP patent application became the basis for the '508 Patent and was rejected by the USPTO in 1988 and subsequently abandoned.

47.     Thereafter, between 1988 and 1993, Lockwood sequentially filed four additional "continuation" patent applications, each having fundamentally identical patent specifications as the 1986 filing.  These applications were also rejected by the USTPO and subsequently abandoned.

48.     Finally, on November 30, 1994, Lockwood filed yet another continuation patent application, U.S. application No. 08/347,270 (the "'270 Application") which was originally titled "Automatic Loan Processing Terminal System."

49.     While the '270 Application was pending, Lockwood filed U.S. application No. 08/418,772 (the "'772 Application"), which used the same patent specification used in his six previous patent applications, all relating back to the 1986 CIP patent application filing.

50.     After eleven years of prosecution, the '772 Application was issued as the '508 Patent.

51.     The '772 Application originally included seven claims that were seemingly directed to an inventory control system even though the specification was directed to a loan system, such as that which might be used by a bank or other financial institution.

52.     Lockwood added Claims 8 through 15 in a first preliminary amendment and added Claims 16 and 17 in a second preliminary amendment.

53.     In a first office action dated February 3, 1997, the examiner rejected all claims under 35 U.S.C. § 112 (lack of written description) and 35 U.S.C. § 103 (an obvious combination of known art) over Lockwood's own prior patent application.

54.     Specifically, the examiner determined that the specification failed to provide a detailed description of the "means" terms used in the claims.

55.     According to the patent examiner, without the detailed description of the means terms, the specification could only support a system or method for processing a loan and not (as characterized by Lockwood) to (a) an inventory exchange as claimed in Claims 1-7, (b) an information searching system as claimed in Claims 8-15, or (c) an automated multimedia network as per Claims 16-17.  *See* '508 File History, July 7, 1997 amendment, p. 12.

56.     Lockwood filed a response on July 7, 1997, which amended the claims and, attempting to overcome the § 112 rejection, described where the "means" terms for several of the claims' elements could be found.  Notably, in doing so, Lockwood defined and limited the scope of the claims' elements.  *Id*. at 2-15.

57.     With respect to the § 103 rejection, Lockwood stated that the claimed system was fundamentally different from the earlier Lockwood patent because the system

described in the previous patent was a menu-driven system that employed a rigid, pre-ordained sequence of menus and sub-menus. *Id.* at 20. As a result, Lockwood argued that "[i]n this primitive type of interactive process, the machine need not analyze the answer because each answer leads progressively to the next predetermined step in accordance with the sequence imposed by the menu tree." *Id.* at 16. Lockwood alleged that this difference distinguished the prior Lockwood patented system from that of the '508 Patent application because:

> The claimed system *has the ability of interpreting an answer before moving to the next step. An answer does not progressively call for a preformatted and unique type of new menu display as in the prior art, but opens the gate for a choice between different types of subsequent displays or actions.* That choice is made by the system.

*Id.* at 17-18 (emphasis added).

58. Lockwood also characterized the claimed invention as a "forward-chaining" system as opposed to a "backward-chaining" system, like that disclosed in the earlier Lockwood patent. *Id.* at 21-22 ("Backward-chaining is a way to emulate human inductive reasoning or goal-directed reasoning. It starts with a selection option and works backward to prove its accuracy. …. a backward-chaining system starts with a user having a goal in mind to be proven"). Lockwood described forward-chaining as:

> a common term of the art designating a way to *emulate human deductive or data-driven reasoning.* The data provided by the user enables the search to begin at an appropriate point. Rules that may be available to the system but do not apply to the problem, are eliminated from consideration by the system. Forward-chaining is generally associated with knowledge bases that have large numbers of possible solutions, and are frequently used when data is the starting point for solving a problem.

*Id.* at 23-24 (emphasis added).

59.     Thus, as defined by Lockwood, the basic distinction between "forward-chaining" and "backward-chaining" is moving forward to, or backward from, a goal. Notwithstanding this stated distinction between forward- and backward-chaining, Lockwood clarified that Claim 16 "specifically recites the 'backward-chaining and forward-chaining', problem solving techniques." *Id.* at p. 25.

60.     On October 28, 1997, the examiner issued a final office action maintaining the prior §§ 112 and 103 rejections. Lockwood then appealed the final rejection to the Board of Patent Appeals and Interferences (the "Board").

61.     During this appeal process, Lockwood amended Claims 1 through 7 so that they were no longer directed to an inventory exchange system.

62.     In a non-precedential decision, the Board reversed the examiner's § 112 rejections on procedural grounds. Specifically, the Board admonished the examiner for failing to provide "reasons why one of ordinary skill in the art would not consider the description in the original disclosure sufficient." '508 File History, Sept. 25, 2000 BPAI Decision, p. 4. However, the Board affirmed the examiner's rejection of Claims 1 through 15 under § 103 and reversed the examiner's § 103 rejection of Claims 16 and 17. With respect to Claims 16 and 17, the Board stated:

> [T]hese claims specifically recited that the acceptance and processing of requests are done "according to *backward-chaining and forward- chaining sequences.*" While these terms do not appear to be part of the original disclosure, *and there may be a question of proper support, there is no rejection, on record, under the written description section of 35 U.S.C. § 112*, regarding the now claimed

"backward-chaining and forward-chaining sequences." ... *We rely on appellant's explanation of these terms in Paper No. 8 and find that Lockwood does not disclose both "backward-chaining and forward-chaining sequences,"* as set forth in instant claim 16.

508 File History, Sept. 25, 2000, BPAI Decision, pp. 4-5 (emphasis added).

63.     On November 28, 2000, in response to the Board's decision, Lockwood filed an amendment modifying Claims 1 and 8 to include references to "backward-chaining and forward-chaining sequences" (the same limitation found in allowable Claims 16 and 17).

64.     On April 23, 2002, the examiner issued an office action again rejecting all remaining claims under § 112 on the ground that the "backward-chaining and forward-chaining sequences" amendment to the claims was not supported by the original disclosure and that the disclosure failed to provide a written description of how the process of accepting and processing requests was performed according to backward-chaining and forward-chaining sequences.

65.     Lockwood appealed the examiner's decision, and it was ultimately reversed by the Board on August 30, 2005. In doing so, the Board noted that the examiner's prior § 112 rejection (which was reversed in the Board's decision issued on September 25, 2020) involved enablement, while the examiner's current § 112 rejection involved lack of written description for the "backward-chaining and forward-chaining sequences" limitation. The Board then concluded that, even though the specification did not mention the terms "backward-chaining" and "forward-chaining," there was nevertheless sufficient

support in the specification for those terms to meet the written description requirement. 508 File History, August 30, 2005, BPAI Decision, pp. 4-5.

66.     Upon the Board's decision, all claims were allowed and the '508 Patent was issued on March 7, 2006.

67.     On September 15, 2012, a Request for *Ex Parte* Reexamination ("EPX") was filed (Control No. 90/012,671).  On July 31, 2013, the examiner issued a final office action rejecting Claims 8 through 15, confirming Claims 1 through 7, 16 and 17, and rejecting Claims 18 through 25 (which had been added during the Reexamination process).  Lockwood sought to amend the rejected Claim 8, but the examiner twice refused to enter the proposed amendments.  During the appeal process, Lockwood cancelled the new Claims 18 through 25 to eliminate issues related to those claims from the appeal.  *See* EPX File History, Dec. 30, 2013, Applicant Remarks, p. 7.

68.     After the Board upheld the examiner's rejection of Claims 8 through 15, Lockwood appealed to the Federal Circuit.  In a non-precedential decision, the Federal Circuit upheld the Board's decision and ruled that Claims 8 through 15 were invalid.  *In re Lockwood (Lawrence B.)*, No. 394, 1995 WL 50725, at *3 (Fed. Cir. Feb. 7, 1995).

69.     On June 6, 2017, the examiner issued a "Notice of Intent to Issue Ex Parte Reexamination Certificate," canceling Claims 8 through 15.  As part of this document, the examiner issued a statement of reasons for patentability and/or confirmation of claims found patentable, and explained that "the reasons for confirmation are set forth in the Office Action of 7/13/2013, pages 122-142, which pages are attached as Appendix to this

NIRC."  *See* EPX File History, June 6, 2017, Notice of Intent to Issue Ex Parte

Reexamination Certificate, p. 2.

70.    The Appendix to the NIRC is a twenty-page document specifically

discussing the USPTO's interpretation of Claims 1 and 16.  Regarding "Forward

Chaining," the USPTO said:

> 'forward- chaining' sequences, as employed by the instant invention, *designate a way to emulate human deductive or data-driven reasoning and is generally associated with knowledge bases that have large numbers of possible solutions*, and are frequently used when data is the starting point for solving a problem [see, pages 22-24 of Paper No. 8]. Appellant also submits dictionary meanings for these terms from the IBM Dictionary. *We rely on appellant's explanation of these terms in Paper No. 8 and find that Lockwood does not disclose both 'backward-chaining and forward-chaining sequences,' as set forth in instant claim 16*.
>
> *      *      *
>
> It appears to us, after reviewing the specification, especially, page 11, lines 13-21, thereof, that the specification does describe a data-driven control since the first analysis determines the identity of any element or data that automatically disqualify an applicant ( Footnote 3: This portion of the analysis maybe said to be 'goal-driven' (the process of qualifying or disqualifying an applicant), or 'backward-chaining.') and then, depending on the result of that analysis, more questions may be presented in order to refine the data necessary for a thorough assessment of an applicant's qualifications. *This is also clearly an iterative procedure for solving a problem until a conclusion is reached or no further inferences can be made*. Therefore, we determine that applicant did, indeed, have possession of processing 'according to backward-chaining and forward-chaining sequences,' as claimed.")

EPX File History, June 6, 2017, Notice of Intent to Issue Ex Parte Reexamination

Certificate - Appendix, p. 125-7 (emphasis added).

71.    Regarding Claim 1, the USPTO stated:

Therefore, in light of MPEP 2258, MPEP 2181, II, and 2183 and the guidelines regarding the court's interpretation of claims supra, *the "means-plus-function" limitation "means for processing said operator-entered information, inquiries, and orders according to backward- chaining and forward-chaining sequences" is now interpreted to require the function corresponding thereto be the ability to automatically process/analyze onsite information requested of or by an operator and orders for transactions* (i.e. order for a decision, in its entirety, or performance of a task processed from information acquired from a customer), entered by said operator via said means for entering information according to backward-chaining (goal-driven) and forward-chaining (data-driven) sequences and *the structure meant thereby to be a data processor (Fig. 2, element 113) of a self-service station/terminal (Figs. 1-2, element 105), as compared to a computerized installation (Fig. 1, elements 101/104) in communication therewith*, which data processor is programmed/software implemented to automatically process/analyze onsite information requested of or by an operator, and orders for transactions (i.e. order for a decision, in its entirety, or performance of a task processed from information acquired from a customer), entered by said operator via said means for entering information (Fig. 2, elements 119, 122) according to backward-chaining (goal-driven) and forward-chaining (data-driven) sequences, and equivalents thereof.

EPX File History, June 6, 2017, Notice of Intent to Issue Ex Parte Reexamination

Certificate - Appendix, pp. 135-136 (emphasis added).

72.     Regarding Claim 16, the USPTO stated:

Therefore, in light of MPEP 2258, MPEP 2181, II, and 2183 and the guidelines regarding the court's interpretation of claims supra, *the "means-plus-function" limitation "means for accepting and processing said requests according to backward-chaining and forward-chaining sequences" of each station is now interpreted to require the function corresponding thereto be that of the ability to accept and automatically process/analyze onsite user entered, via access means, coded requests*, i.e. user identifying access code accompanied requests for user associated information/data, *according to backward-chaining (goal-driven) and forward-chaining (data- driven) sequences and the structure meant thereby to be a data processor (Fig. 2, element 13)*

21

*and memory/OMA (Figure 2, elements 116, 117) of a self-service
station/terminal (Figs. 1-2, element 105)*, which memory/OMA
accepts and which data processor is programmed/software
implemented to process/analyze entirely onsite such coded requests
entered on touch pad or magnetic strip reader (Figure 2, elements 119,
122) according to backward-chaining (goal- driven) and forward-
chaining (data-driven) sequences, and equivalents thereof.

EPX File History, June 6, 2017, Notice of Intent to Issue Ex Parte Reexamination

Certificate - Appendix, pp. 131-132 (emphasis added).

## E.    The '508 Patent's Remaining Two Independent Claims

73.    Claim 1 of the '508 Patent reads as follows:

1. An automated multimedia system for data processing which comprises:

a computerized installation including

a database,

means for entering data into said database, and

a program means for storing, processing, updating, and retrieving
data items in response to coded requests from stations in
communication with said installation;

at least one station including a general purpose computer and a
program applicable to said computer for sending said requests to
said installation;

means for communicating data back and forth between said
installation and said station;

*said station further including*:

a mass memory and means associated therewith for storing and
retrieving textual and graphical data;

a video display and means associated therewith for displaying
textual and graphical data;

means for entering information into said computer;

22

means for programming sequences of inquiring messages on said video display in accordance with preset routines and in response to said information;

> said sequences including instructions to an operator of said station for operating said station; and

means for selectively and interactively presenting to said operator interrelated textual and graphical data describing a plurality of transaction options, and for selectively retrieving data from said mass memory;

means for storing information, inquiries, and orders for transactions entered by said operator via said means for entering information;

means for transmitting said inquiries and orders to said installation via said means for communicating;

means for receiving data comprising operator-selected information and orders from said installation via said means for communicating; and

means for interactively directing the operation of said computer, video display, data receiving and transmitting means, and

mass memory comprising means for holding an operational sequencing list,

*means for processing said operator-entered information, inquiries, and orders according to backward-chaining and forward-chaining sequences, and*

means responsive to the status of said computer, display, mass memory, and data receiving and transmitting means for controlling their operation;

said means for processing including means for analyzing said operator-entered information and

means, responsive to said means for analyzing, for presenting additional inquiries in response to said operator-entered information;

said computerized installation further including:

23

means responsive to items received from said station for immediately transmitting selected data retrieved from said database to said station;

means responsive to an order received from said station for updating data in said database including means for correlating to a particular set of data received from said station;

whereby said system can be used by a plurality of entities, each using one of said stations, to exchange data, and to respond to inquiries and orders instantaneously or over a period of time.

'508 Patent, Claim 1 (structure and emphasis added).

74. Claim 16 of the '508 Patent reads as follows:

16. An automated multimedia data processing system which comprises:

*at least two computerized stations*, each including:

at least one access means;

a mass memory and a database stored in said mass memory;

means for storing, processing, updating, and retrieving data;

program means for controlling said storing, processing, updating, and retrieving data means in response to coded requests entered on said access means;

means, associated with said mass memory, for storing and retrieving textual and graphical data;

means for processing interrelated textual and graphical data describing a plurality of transaction options, and

for selectively retrieving data from said mass memory; interrelated textual and graphical data stored in said mass memory, and accessible through interrelated textual and graphical access path means;

*means for accepting and processing said requests according to backward-chaining and forward-chaining sequences;*

means responsive to said coded requests for automatically displaying selected data;

24

means for interactively directing the operation of said various means,

and of said mass memory, said means for directing comprising means for holding an operational sequencing list and means responsive to the status of said mass memory, and said various means, for controlling their operations.

'508 Patent, Claim 1 (structure and emphasis added).

75.    Accordingly, to infringe the claims of the '508 Patent, if they were valid, which NAPCO does not concede, NAPCO would have to use a system which includes *all* of the above elements of either Claim 1 or 16.

76.    Specifically, in addition to the other numerous claim elements, an infringing system would have to use a workstation (i.e., a remote device) having "*means for processing said operator-entered information, inquiries, and orders according to backward-chaining and forward-chaining sequences*" from Claim 1 and/or a *means for accepting and processing said requests according to backward-chaining and forward-chaining sequences*" from Claim 16.

77.    Accordingly, an infringing party must utilize forward-chaining (as defined above) which is much more than a predetermined menu tree system website.

78.    Furthermore, this sophisticated forward-chaining process must be performed on the customer's devices (such as client computers) as opposed to the servers hosting the website.

25

**F.     NAPCO's Websites Do Not Infringe the Claims of the '508 Patent**

79.     NAPCO has not infringed Claim 1 or Claim 16, or any other valid claim of the '508 Patent, because NAPCO's services and websites do not practice *every* limitation of Claim 1 or Claim 16.

80.     Upon information and belief, Landmark failed to undergo a reasonable infringement analysis prior to sending its Demand Letter.

81.     As noted previously, the Demand Letter does not include an element-by-element description, or any other type of analysis of NAPCO's products, services, or technology that Landmark alleges infringe the claims of the '508 Patent.  Instead, it merely includes two links for the website, https://binders.com and https://binders.com/my-account.

82.     The Demand Letter fails to include any factual allegations concerning the specific areas or ways in which the website (www.binders.com) infringes the '508 Patent or are covered by the specific claims in the '508 Patent.

83.     Indeed, upon information and belief, Landmark did not perform any reasonable due diligence of NAPCO's systems or services prior to demanding payment from NAPCO in the amount of $65,000 and threatening NAPCO with legal action.

84.     For a customer to access the website at issue in this case –
www.binders.com – the customer (or the computer manufacturer) must first choose to install third party internet browser software (such as Explorer, Firefox, or Safari) onto the

customer's computer or device. A customer can then "visit" the website by typing a URL (e.g., www.binders.com) into a text box of the browser.

85.     This customer action causes the customer's internet browser to send a request to the third-party's web server which hosts the website via standard internet connection. In response to the request from the customer's browser, a third-party web server causes the simple menu driven website to be displayed onto the customer's device. The customer then interacts with the rigid, pre-ordained menus displayed on the customer's devices on order to select and order products.  The website is "static" in that it makes use of rigid menu-like interfaces, ensuring that every user's experience is the same.

86.     The website is hosted by a third party's web server farm.  NAPCO does not own, operate, or host its own web servers or web server farm.  Nor does NAPCO own, operate, or control the computers or mobile devices its customers use to access the website.

87.     Moreover, such computers and mobile devices, which the '508 Patent would call terminals, do not utilize any dynamic and sophisticated "forward-chaining" analysis when interacting with NAPCO's websites.  In fact, no NAPCO server, computer, or device uses "forward-chaining" technology in any way to display or host the website.

88.     Landmark alleges the NAPCO's servers constitute an infringing use of Claim 1 of the '508 Patent when customers use devices (i.e., terminals) to interact with NAPCO's web servers.

27

89.     NAPCO does not infringe any valid and enforceable claim of the '508

Patent for reasons including, but not limited to, the fact that the terminals (i.e., customer

devices) accessing NAPCO's websites are not owned or used by NAPCO.

90.     Moreover, even if such terminals were owned or used by NAPCO, such

terminals do not utilize any "forward-chaining" technology in accessing the website,

which is required by even a cursory construction of Claims 1 and 16 of the '508 Patent;

and no server, computer or device associated with NAPCO uses "forward-chaining"

technology at all, which is required by Claims 1 and 16 of the '508 Patent.

## Count I
## Declaration of Non-Infringement
(*28 U.S.C. § 2201*)

91.     NAPCO restates and incorporates by reference the allegations in paragraphs

1 through 90 of this Complaint as if fully set forth herein.

92.     NAPCO has not infringed and does not infringe any valid and enforceable

claim of the '508 Patent, whether literally or under the doctrine of equivalents.

93.     Additionally, NAPCO is not liable for any induced, contributory, divided,

or other indirect infringement of any valid enforceable claim of the '508 Patent. Neither

NAPCO, its customers who access its website, nor anyone associated with NAPCO,

utilize all of the elements of the claims of the '508 Patent.

94.     There exists a substantial, real and immediate controversy between NAPCO

and Landmark concerning NAPCO's alleged infringement of the '508 Patent, which

NAPCO denies, and this controversy warrants the issuance of a declaratory judgment.

28

95. The controversy arises from a Demand Letter in which Landmark claims NAPCO infringes, at the least, Claim 1 of the '508 Patent and provides NAPCO an option to pay for a license to Landmark's patent portfolio, including the '508 Patent within 15 days of its post-marked date, or to face potential litigation.

96. Landmark's Demand Letter alone, and in combination with Landmark's widespread campaign of filing patent infringement lawsuits against licensing targets that refuse to pay the license fee Landmark demands, clearly demonstrate Landmark's intent to attempt erroneously to enforce the '508 Patent against NAPCO.

97. Thus, a judicial declaration is necessary and appropriate so that NAPCO may ascertain its rights regarding the '508 Patent.

98. NAPCO therefore seeks a judicial declaration that NAPCO does not directly, indirectly, or otherwise infringe any valid and enforceable claim of the '508 Patent.

## Count II
## Violation of North Carolina Abusive Patent Assertion Act
### (*N.C. Gen. Stat. §§ 75-140,* et seq.)

99. NAPCO restates and incorporates by reference the allegations in paragraphs 1 through 99 of this Complaint as if fully set forth herein.

100. Landmark's assertion of NAPCO's patent infringement in the Demand Letter is abusive and made in bad faith. The Demand Letter fails to include information necessary to evaluate the infringement claim such as factual allegations concerning the specific areas in which NAPCO's products, services, and technology infringe the '508

29

Patent or are covered by specific, identified claims in the '508 Patent. *See* N.C. Gen. Stat. § 75-143(a)(1).

101.    Upon information and belief, prior to sending the Demand Letter, Landmark Failed to conduct an analysis comparing the claims in the '508 Patent to NAPCO's products, services, and technology, or, if the analysis was done, the Demand Letter fails to identify the specific areas in which the products, services, and technology of NAPCO are covered by the claims in '508 Patent. *See id.* § 75-143(a)(2).

102.    The Demand Letter includes a demand for payment of the $65,000 license fee and a response in an unreasonably short period of time – 15 days of the date of the Demand Letter. *See id.* § 75-143(a)(4).

103.    The license fee is based, upon information and belief, not on a reasonable estimate of the value of the license, but instead on the cost of defending a potential or actual lawsuit. *See id.* § 75-143(a)(5).

104.    The claim and assertion of patent infringement as set forth in the Demand Letter is objectively meritless and Land knew or should have known that the assertion was meritless. *See id.* § 75-143(a)(6).

105.    The Demand Letter is deceptive in that it fails to disclose the true nature and history of the '508 Patent, describes the patent as a "pioneer patent," and intentionally employs a nonsensical and unnecessarily dense and vague and ambiguous description of the alleged infringement. *See id.* § 75-143(a)(7).

106.    Upon information and belief, and has evidenced by the sampling of cases set forth above, Landmark and its related and affiliated entities or principals have made

and continue to make the same demand or substantially same demand to multiple recipients and have made assertions against a wide variety of products and systems without reflecting those differences in a reasonable manner in those demands. *See id.* § 75-143(a)(9).

107. As a result of Landmark's bad faith and abusive assertion of NAPCO's infringement of the '508 Patent, NAPCO has suffered damages and incurred costs, fees (including attorneys' fees), and expenses in investigating and defending against the bad faith claim of infringement, and other harm, all of which are recoverable under the North Carolina Abusive Patent Assertion Act. *See* N.C. Gen. Stat. §§ 75-145(b)(1)-(3).

108. NAPCO, therefore, seeks recovery of its damages in an amount to proven at trial and together with an award of exemplary damages in an amount equal to $50,000 or three (3) times the total of damages, costs, and fees, whichever is greater. *See id.* § 75-145(b)(4).

WHEREFORE, NAPCO respectfully requests the following relief:

A. A declaration that NAPCO has not infringed and does not infringe, directly or indirectly, any valid and enforceable claim of the '508 Patent, whether literally or under the doctrine of equivalents;

B. An order declaring that this is an exceptional case and awarding NAPCO its costs, expenses, disbursements, and reasonable attorney's fees under 35 U.S.C. § 285;

C. An order declaring Landmark's conduct as unlawful, unfair, and deceptive trade practices;

D. An order awarding NAPCO all damages, costs, expenses, and fees (including reasonable attorneys' fees) incurred by NAPCO as a result of,

31

and caused by, Landmark's unlawful acts, including exemplary damages as contemplated by the North Carolina Abusive Patent Assertion Act, together with all pre- and post-judgment interest, as provided by law; and

E.      All such other and further relief, both at law and in equity, which this Court deems just and proper.


Dated:  January 11, 2021.

**WALDREP WALL BABCOCK & BAILEY PLLC**

*/s/ Kelly A Cameron.*
Kelly A. Cameron (NC Bar No. 55664)
Natalia L. Talbot (NC Bar No. 55328)
1076 West Fourth Street
Winston-Salem, North Carolina 27101
Telephone:  336.714.1226
Email: kcameron@waldrepwall.com
        ntalbot@waldrepwall.com
        notice@waldrepwall.com

*Attorneys for NAPCO, Inc.*