```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NAPCO, INC.,                    )
                               )
              Plaintiff,       )
                               )
         v.                    )      1:21-CV-00025
                               )
LANDMARK TECHNOLOGY A, LLC,    )
                               )
              Defendant.       )
```

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This is a patent case in which Plaintiff NAPCO, Inc. ("NAPCO") seeks a declaration that a patent of Defendant Landmark Technology A, LLC ("Landmark") is invalid as well as recovery for alleged abusive patent practices. Before the court is the motion of Landmark to dismiss Count III of NAPCO's first amended complaint, which alleges a violation of the North Carolina Abusive Patent Assertions Act ("the Act" or "the APAA"), N.C. Gen. Stat. § 75-140 et seq., a statute that has not been construed by any court. (Doc. 17.) Landmark argues that NAPCO has failed to plead the essential elements of the offense, that the Act is preempted by federal law, and that the Act violates the First and Fourteenth Amendments to the U.S. Constitution as well as the Commerce Clause. (Doc. 18.) NAPCO has responded in opposition (Doc. 39), and the Attorney General of North Carolina submitted an amicus brief to defend the validity of the Act (Doc. 49). A separate amicus brief

was submitted by various companies and retail and technology groups also in defense of the Act. (Doc. 50.) NAPCO further moves for expedited, limited discovery. (Doc. 37.) For the reasons set forth below, both motions will be denied.

## I. BACKGROUND

### A. Factual Background

NAPCO's first amended complaint makes the following factual allegations, which the court accepts as true for the purposes of the motion to dismiss:

NAPCO is a North Carolina corporation and owner of www.binders.com ("the website"). (Doc. 15 ¶ 3.) Vulcan, NAPCO's wholly-owned subsidiary, operates the website. (Id.)

Landmark is a limited liability company organized under the laws of North Carolina and with its principal place of business in Durham. (Id. ¶ 5.) Its annual reports with the North Carolina Secretary of State indicate that its business is "Patent Licensing." (Id. ¶ 6.) Landmark owns the rights to U.S. Patent No. 7,010,508 C1 ("the '508 patent") (Doc. 15-1 at 2), which it has sought to enforce against potential infringers through the issuance of demand letters (Doc. 15 ¶¶ 18-19).[1] These demand letters are allegedly identical and include the same offer to

---

[1] The content of the '508 patent, entitled "Automated Business and Financial Transaction Processing System," (Doc. 15 ¶ 45), is not relevant to the motions before the court. Accordingly, the court does not detail the patent here.

license the patent for a fee of $65,000.  (Id. ¶¶ 31-32.)

In October 2020, NAPCO received a demand letter from Landmark that accused NAPCO and the website of infringing on the '508 patent and that offered a non-exclusive license to the '508 patent for $65,000.  (Id. ¶¶ 12, 36; Doc. 15-1.)  The demand letter indicated that the $65,000 license fee represents "a substantial discount to the historic licensing price of Landmark's portfolio, and w[ould] not be available in the event of litigation." (Doc. 15 ¶ 43; Doc. 15-1 at 3.)  The demand letter did not include the name or address of the patentholder, nor did it include an element-by-element claim analysis or description of services that allegedly infringed the '508 patent.  (Doc. 15 ¶¶ 36, 38.)  Landmark requested that NAPCO respond to the demand letter within 15 days.  (Id. ¶ 43.)

NAPCO contends that the website does not infringe on the '508 patent and that Landmark knew or should have known that fact, and that Landmark willfully disregarded the falsity of its assertion in sending NAPCO the demand letter.  (Id. ¶¶ 105-08.)  Based on these allegations, NAPCO's amended complaint seeks a declaration of noninfringement on the '508 patent (Count I) and a declaration of invalidity of the '508 patent (Count II).  (Id. ¶¶ 110-21.)  NAPCO also brings a claim against Landmark for asserting patent infringement in bad faith in violation of the APAA (Count III). (Id. ¶¶ 122-32.)  Landmark now moves to dismiss Count III of the amended complaint, arguing (1) NAPCO has failed to plead the

3

essential elements of a claim under the APAA; (2) the APAA is preempted by federal law, both facially and as applied to this case; and (3) the APAA is unconstitutional because it violates the First and Fourteenth Amendments to the U.S. Constitution as well as the dormant Commerce Clause. (Doc. 18.) The motion is now fully briefed and ready for resolution. (See Docs. 39, 49, 50, 53, 54.)

NAPCO has also moved for expedited, limited discovery as to "matters relating to the corporate structure, status, liquidity, and historical assertions of patent infringement by . . . Landmark . . . to support a possible motion for bond under N.C. Gen. Stat. § 75-144." (Doc. 38 at 1; see Doc. 37.) This motion is also fully briefed and ready resolution. (See Docs. 38, 51.)

**B.  Background of the Abusive Patent Assertions Act**

At issue in this case is the North Carolina Abusive Patent Assertions Act, enacted by the North Carolina General Assembly in 2014. See N.C. Gen. Stat. 75-140 et seq. In promulgating the Act, North Carolina joined a growing number of states that have passed similar laws in an attempt to address the problems presented by non-practicing entities, known colloquially as "patent trolls,"[2] that make bad faith assertions of patent infringement. See Jason

---

[2] "A patent troll is somebody who tries to make a lot of money off a patent that they are not practicing and have no intention of practicing and . . . [have] never practiced." Overstock.com, Inc. v. Furnace Brook, LLC, 420 F. Supp. 2d 1217, 1218 (D. Utah 2005), aff'd, 191 F. App'x 959 (Fed. Cir. 2006) (internal quotation marks omitted).

D. Gardner & Stephen J.E. Dew, <u>North Carolina Abusive Patent</u> <u>Assertions Act: A Powerful Gun, but Will It Hold Up in a Gunfight?</u>, 17 N.C. J. L. & Tech. 391, 410-15 (2016).

The Act prohibits a person from making "a bad faith assertion of patent infringement." N.C. Gen. Stat. § 75-143. The statute does not define "bad faith assertion" but lists factors a court may consider to determine whether a defendant has made a bad faith assertion, including certain deficiencies in the demand letter; a demand for payment of a fee within an unreasonably short period of time; actual or constructive knowledge by the patentholder that the assertion of patent infringement was meritless; the deceptive nature of the assertion; and whether the person has sent the same demand to multiple recipients and against a wide variety of products without demand letters reflecting differences between recipients. <u>Id.</u> § 75-143(a). The statute also lists factors a court may consider as evidence that the assertion was not made in bad faith, including that the demand letter was not deficient; the defendant made a good faith effort to establish that the plaintiff infringed the patent; the defendant made a substantial investment in the use of the patent or in the production or sale of a product or item covered by the patent; and the defendant demonstrated good faith business practices in previous efforts to enforce the patent or a substantially similar patent. <u>Id.</u> § 75-143(b).

With this understanding of the Act, the court now turns to

the motions before it.

## II.  ANALYSIS

### A.  Motion to Dismiss

#### 1.  Legal Standard

While the Federal Circuit has exclusive jurisdiction over appeals involving patent issues, application of Federal Rule of Civil Procedure 12(b)(6) in patent cases is a procedural question governed by the law of the regional circuit. W.L. Gore & Assocs. v. Medtronic, Inc., 850 F. Supp. 2d 630, 632 (E.D. Va. 2012) (citing McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1355–56 (Fed. Cir. 2007)).  Therefore, this court applies the rule of the Fourth Circuit.  See Polymer Indus. Prods. Co v. Bridgestone/Firestone, Inc., 347 F.3d 935, 937 (Fed. Cir. 2003); see also McZeal, 501 F.3d at 1356.

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2).  Under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  In

6

considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor. Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). "Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegation 'to raise a right to relief above the speculative level' so as to 'nudge[] the[] claims across the line from conceivable to plausible.'" Sauers v. Winston-Salem/Forsyth Cnty. Bd. Of Educ., 179 F. Supp. 3d 544, 550 (M.D.N.C. 2016) (alteration in original) (quoting Twombly, 550 U.S. at 555). "[T]he complaint must 'state[] a plausible claim for relief' that permit[s] the court to infer more than the mere possibility of misconduct based upon 'its judicial experience and common sense.'" Coleman v. Md. Ct. App., 626 F.3d 187, 190 (4th Cir. 2010) (alterations in original) (quoting Iqbal, 556 U.S. at 679). Thus, mere legal conclusions are not accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

In ruling on a motion to dismiss, courts may consider documents attached to either the complaint or the motion to dismiss without converting the motion into one for summary judgment so long as the documents are "integral to the complaint and

7

authentic." Philips v. Pitt Cnty. Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

## 2. Pleading the Essential Elements of a Violation

Landmark first argues that Count III must be dismissed because NAPCO has failed to allege essential elements required to state a violation of the Act. (Doc. 18 at 5.) Specifically, Landmark contends that the Act amended the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") and therefore claims under the Act must satisfy both the specific requirements of the Act as well as the more general pleading requirements of N.C. General Statute § 75-1.1. (Id. at 5-6.) Landmark further argues that NAPCO has failed to plead an "actual injury" and "reliance" as required by § 75-1.1. (Id. at 6-9.) In response, NAPCO contests the applicability of the pleading requirements of § 75-1.1 to claims brought under the Act. (Doc. 39 at 6-10.)

As a federal court construing North Carolina law, this court is obliged to apply the jurisprudence of North Carolina's highest court, the Supreme Court of North Carolina. See Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002). When that court has not spoken directly on an issue, this court must "predict how that court would rule if presented with the issue." Id. The decisions of the North Carolina Court of Appeals are the "next best indicia" of what North Carolina's law is, though its decisions "may be disregarded if the

federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. (quoting Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992)). In predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted).

The North Carolina APAA has not been interpreted by any court. As such, the issue presented is one of first impression. Thus, this court is tasked with predicting what North Carolina's highest court would conclude about the elements of a claim under the APAA. See Private Mortg., 296 F.3d at 312. In construing the North Carolina Act, the court applies the state law principles of statutory construction enunciated by the North Carolina Supreme Court. See Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co., 510 F.3d 474, 482 (4th Cir. 2007). "In interpreting a statute, it is a general rule of construction that a statute is to be interpreted according to the intent of the legislature as gleaned from the language of the statute, the spirit of the statute and the purposes to be accomplished by the statute." Foremost Ins. Co. v. Ingram, 232 S.E.2d 414, 418 (N.C. 1977). "[W]hen the language of a statute is clear and unambiguous, there is no room

for judicial construction, and the courts must give it its plain and definite meaning." Lanvale Props., LLC v. Cnty. of Cabarrus, 731 S.E.2d 800, 809–10 (N.C. 2012).

The APAA is codified as Article 8 of Chapter 75. The Act makes it "unlawful for a person to make a bad-faith assertion of patent infringement," N.C. Gen. Stat. § 75-143, and permits "[a] target or person aggrieved by a violation of this Article or by a violation of rules adopted under this Article [to] bring an action . . . against a person who has made a bad-faith assertion of patent infringement," id. § 75-145(b). Successful litigants may be awarded equitable relief, damages, costs and fees, including attorney's fees, and "[e]xemplary damages" of the greater of $50,000 or three times the total of damages, costs, and fees. Id. A separate provision of the Act allows a court to require an alleged violator to post a bond equal to a good-faith estimate of the target's fees and costs for litigating the claim and amounts likely to be recovered under § 75-145. Id. § 75-144(a). Prior to doing so, however, the court must find that a target has established a "reasonable likelihood that a person has made a bad-faith assertion of patent infringement in violation of this Chapter." Id.

Section 75-1 is contained in Article 1 of Chapter 75, which is entitled "General Provisions," and declares illegal any combinations in restraint of trade. Section 75-1.1, also within

10

Article 1, is entitled "Methods of competition, acts and practices regulated; legislative policy." Section 75-1.1(a) provides: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). North Carolina courts have held that § 75-1.1 contains three generalized pleading requirements, namely that (1) the defendant committed an unfair or deceptive act or practice (2) that was in or affecting commerce (3) which proximately caused injury. Reid v. Ayers, 531 S.E.2d 231, 235 (N.C. Ct. App. 2000); see also Stack v. Abbott Lab'ys, Inc., 979 F. Supp. 2d 658, 666–67 (M.D.N.C. 2013). Additionally, where a claim under § 75-1.1 stems from an alleged misrepresentation, a plaintiff must also demonstrate reliance on that misrepresentation to prove proximate causation. Bumpers v. Cmty. Bank of N. Va., 747 S.E.2d 220, 226 (N.C. 2013).

Not all articles contained in Chapter 75[3] are subject to the generalized pleading requirements of § 75-1.1 as a matter of course. See Reid, 531 S.E.2d at 234-35. Rather, there must be an indication that the General Assembly intended to limit an article by those requirements. See id. For example, in Reid, the North

---

[3] The remaining articles are entitled as follows: Article 2 - Prohibited Acts by Debt Collectors; Article 2A - Identity Theft Protection Act; Article 3 – Motor Fuel Marketing Act; Article 4 – Telephone Solicitations; Article 5 – Unsolicited Facsimiles; Article 5A – Home Foreclosure Rescue Scams; Article 6 – Truth in Advertising Act; Article 7 – Credit Monitoring Services Act.

11

Carolina Court of Appeals analyzed Article 2 of the UDTPA and found — based on the language employed in the article, rather than its codification within Chapter 75 — that the General Assembly intended the article to be limited by the generalized requirements of § 75.1-1. Id. Although the article did not specially state that it was subject to the requirements of § 75-1.1, the court found that the General Assembly intended as much based on the following language contained in the final section of the article:

> The specific and general provisions of this Article shall exclusively constitute the unfair or deceptive acts or practices proscribed by G.S. 75-1.1 in the area. Notwithstanding the provisions of G.S. 75-15.2 and G.S. 75-16, in private actions or actions instituted by the Attorney General, civil penalties in excess of two thousand dollars ($2,000) shall not be imposed, nor shall damages be trebled for any violation under this Article.

Id. The court reasoned that the specific invocation of § 75-1.1, coupled with its implicit reference to Article 1's allowance for trebled damages, demonstrated the General Assembly's intent to limit Article 2 by the pleading requirements of § 75-1.1.

Relying on Reid, Landmark contends that the Act is similarly subject to the pleading requirements § 75-1.1. Landmark points to the language of § 75-144 which states that a bond may only be imposed on a person if there is a "reasonable likelihood" the "person has made a bad-faith assertion of patent infringement in violation of this Chapter." (Doc. 53 at 3 (emphasis added).) It further contends that § 75-144's reference to § 75-145 links the

12

provisions such that § 75-145 is also limited by § 75-1.1's generalized pleading requirements. See N.C. Gen. Stat. § 75-144 (allowing the court to impose a bond on a person that "has made a bad-faith assertion of patent infringement in violation of this Chapter" and the bond may include "amounts reasonably likely to be recovered under G.S. 75-145").

This is unpersuasive. As with the article at issue in Reid, the Act does not specifically state that it is subject to the generalized pleading requirements of § 75-1.1. But unlike Reid, the Act contains no specific reference to § 75-1.1 or Article 1. Further, in contrast with Article 2, § 75-145 does not assume that violations of the Act will be subject to the damages provision of Article 1. Compare N.C. Gen. Stat. § 75-56 (exempting civil penalties in excess of $2,000 under the article from Article 1's trebled damages provision) with N.C. Gen. Stat. § 75-145(b) (detailing remedies available to a prevailing plaintiff without explicit or implicit reference to Article 1). In fact, in reference to enforcement actions by the Attorney General, the statute explicitly states that the Attorney General may "make rules, conduct civil investigations, bring civil actions, and enter into assurances of discontinuance as provided under this Chapter" and further that "the court may award or impose any relief available under this Chapter." See N.C. Gen. Stat. § 75-145(a) (emphasis added). The fact that the General Assembly specifically

13

articulated that the Attorney General's powers under the Act include those powers outlined elsewhere in Chapter 75 is indicative of the General Assembly's intent that the Act would not be subject to other provisions of Chapter 75 as a matter of course. Notably, no similar invocations of Chapter 75 appear in § 75-145(b) under which this action is initiated.

Landmark places significant weight on the term "this Chapter" in connection with "a bad-faith assertion of patent infringement" in § 75-144(a). However, this language does not reveal an intent that the Act be subject to the pleading requirements of § 75-1.1, which is simply one provision among the nine articles and over one hundred provisions included in Chapter 75. Had the General Assembly intended to link the Act to the requirements of § 75.1-1, it was aware how to do so – the Reid decision was issued in 2000, fourteen years before the promulgation of the Act. Indeed, the General Assembly has explicitly linked multiple other provisions within Chapter 75 to § 75-1.1. See, e.g., N.C. Gen. Stat. § 75-40 ("A violation of this section is an unfair trade practice under G.S. 75-1.1.); id. § 75-64 ("A violation of this section is a violation of G.S. 75-1.1."); id. § 75-122 ("A violation of G.S. 75-121 is an unfair trade practice under 75-1.1."); id. § 75-128 ("A violation of this Article shall be an unfair and deceptive trade practice under G.S. 75-1.1."). There would have been no need to do so if § 75-1.1 applied to all

14

provisions of all articles of Chapter 75 as a matter of course. Here, the fact that the General Assembly used language neither implicitly nor explicitly connecting the Act to Article 1 or § 75-1.1, despite the Reid decision, suggests that the General Assembly did not have an intention to do so.

In light of this analysis, the court rejects Landmark's contention that a claim for a violation of the Act must allege the elements of a claim under § 75-1.1. Rather, a claimant must allege those elements required by the Act itself, namely that they are a target or person aggrieved by a violation of the Act.[4] See N.C. Gen. Stat. § 75-145(b).

Alternatively, Landmark contends that NAPCO has not met the requirements of the Act itself because it has not been "aggrieved," as required by § 75-145(b). (Doc. 53 at 3-4.) NAPCO indicates that it has been aggrieved by Landmark's alleged bad faith infringement claim in that it "was forced to divert resources from operating its business to address Landmark's claim," which included researching, reviewing, and investigating the claim, corresponding with attorneys, and defending against the claim, as well as incurring costs and fees, including attorneys' fees. (See Doc. 39 at 8; Doc. 15 ¶¶ 130-31.) In response, Landmark argues that these damages do not constitute an injury under the law.

---

[4] As discussed in greater detail, infra, claimants must also allege objective and subjective bad faith as required by federal law.

15

(Doc. 53 at 3-4.)

The Act contains no definition of the term "aggrieved." However, the North Carolina Supreme Court has previously explained that the term "person aggrieved" has "no technical meaning" and that "[w]hat it means depends on the circumstances involved." In re Halifax Paper Co., 131 S.E.2d 441, 446 (N.C. 1963); see also N.C. Forestry Ass'n v. N.C. Dep't of Env't & Nat. Res., Div. of Water Quality, 571 S.E.2d 602 (N.C. Ct. App. 2002), rev'd on other grounds, 588 S.E.2d 880 (N.C. 2003). "[Aggrieved] has been variously defined: 'Adversely or injuriously affected; damnified, having a grievance, having suffered a loss or injury, or injured; prejudiced; also having cause for complaint. More specifically the word(s) may be employed meaning adversely affected in respect of legal rights, or suffering from an infringement or denial of legal rights.'" In re Halifax Paper, 131 S.E.2d at 446 (quoting 3 C.J.S. Aggrieved, p. 350). Accordingly, in order to determine the meaning of "aggrieved" in the context of the Act, "the circumstances involved" must be examined.

Since 2013, over two dozen states have enacted statutes focused on curbing bad faith assertions of patent infringement by so-called "patent trolls." See Gardner & Dew, supra, at 410-15; (see also Doc. 50 at 4 (indicating that 32 states have passed such statutes)). The North Carolina General Assembly, in addressing the purpose of the Act, found that while "[t]he General Assembly

16

does not wish to interfere with good-faith patent litigation," the "expense of patent litigation, which may cost millions of dollars, can be a significant burden on companies." N.C. Gen. Stat. § 75-141(a)(3)-(4). It further explained that "[a]busive patent litigation, and especially the assertion of bad-faith infringement claims, can harm North Carolina companies." Id. § 75-141(a)(6). It detailed that a business that receives a bad-faith infringement claim "faces the threat of expensive and protracted litigation and may feel that it has no choice but to settle and to pay a licensing fee even if the claim is meritless." Id. The General Assembly found that this is a particular concern for small- and medium-sized companies that "lack the resources to investigate and defend themselves against infringement claims." Id. Further, it declared, bad faith claims harm the economy more broadly in that "[f]unds used to avoid the threat of bad-faith litigation are no longer available to invest, produce new products, expand, or hire new workers." Id. § 75-141(a)(7). In enacting the APAA, the General Assembly expressed particular concern about "abusive patent assertion entities who have limited liability, as these companies may hold no cash or other assets" and therefore were not deterred from making such bad faith assertions under preexisting law. See id. § 75-141(a)(9); see also 35 U.S.C. § 285 (allowing prevailing defendants in patent infringement actions to recover costs and attorneys' fee awards in "exceptional cases").

17

The purpose of the Act, as articulated by the General Assembly, informs the understanding of the meaning of "aggrieved." Section 75-141, entitled "Purpose," sets out multiple reasons for the Act, which in substance provide that the law is designed to prevent companies from being forced to unnecessarily expend resources in investigating and defending against bad faith assertions of patent infringement, or being forced to pay an unnecessary licensing fee, which the General Assembly considered particularly pressing in light of the high cost and complexity of patent litigation coupled with the understanding that, under the prior status quo, companies with few assets were not deterred from making such assertions. N.C. Gen. Stat. § 75-141. Given this, someone is aggrieved under the Act when he receives a bad faith assertion of patent infringement and as a result expends funds investigating or defending himself from the claim or paying a licensing fee despite the claim being meritless. In conformity with North Carolina tort law, such damages would not include those that are "uncertain and speculative," but may include damages such as lost profits where "such loss is the direct and necessary result of the defendant's wrongful conduct, and such profits are capable of being shown with a reasonable degree of certainty." Reliable Trucking Co. v. Payne, 65 S.E.2d 132, 133 (N.C. 1951). Not included in the term "aggrieved," as used in the Act, however, are "[c]osts and fees, including reasonable attorneys' fees," which

18

the Act considers separate from damages.  See N.C. Gen. Stat. § 75-145(b).

NAPCO's allegations of harm closely align with North Carolina's judicial definition of "aggrieved."  Specifically, NAPCO contends that it was forced to divert resources to research, review, and investigate Landmark's claim, as well as correspond with attorneys and defend against the claim.  (See Doc. 39 at 8; Doc. 15 ¶¶ 130-31.)  In light of these allegations, NAPCO has plausibly pleaded that it has been aggrieved by Landmark's violation of the Act.  As such, Landmark's motion to dismiss the claim on these grounds will be denied.[5]

### 3. Preemption

Landmark next alleges that the Act is preempted by federal law, such that dismissal is demanded.  Landmark contends that, due to multiple conflicts with federal patent law, the Act is preempted as a whole.  (Doc. 18 at 13-15.)  It further contends that, even if the Act is not wholly preempted, NAPCO has failed to meet the

---

[5] In its reply brief, Landmark suggests for the first time that, for the same reasons NAPCO has not been "aggrieved," NAPCO also lacks standing to bring this claim.  (Doc. 53 at 3-4.)  This appears to be an argument regarding injury-in-fact.  (See id.)  Typically, it is not proper to raise new arguments in a reply brief.  Parker v. United States, No. 1:05CR158-1, 2008 WL 11491651, at *10 (M.D.N.C. Mar. 3, 2008), report and recommendation adopted, No. 1:05CR158-1, 2008 WL 11491650 (M.D.N.C. May 19, 2008).  Regardless, for the reasons discussed, supra, the court finds that NAPCO has sufficiently alleged an injury-in-fact.  See Duke Power Co. v. Carolina Envtl. Study Grp., 438 U.S. 59, 72 (1978) (explaining that injury-in-fact requires a "distinct and palpable injury" that is "fairly traceable" to the challenged conduct).

pleading requirements of federal patent law to survive dismissal.
(Id. at 9-13.)  Each of these arguments is addressed in turn.

### a.    Facial preemption

Landmark identifies three grounds upon which it contends the
Act should be found to be facially preempted based upon conflicts
with federal law.  First, it argues that the standard of proof
required by the Act conflicts with the "clear and convincing
evidence" standard required under federal law.  (Id. at 13.)
Second, relying on the Act's non-exhaustive list of factors to
consider in determining the existence of "bad faith," it contends
that the Act's definition of "bad faith" conflicts with federal
patent law because the listed factors are more expansive than the
strict "objective baselessness" standard necessary to establish
bad faith under federal law.  (Id. at 14.)  Finally, it argues
that the Act improperly requires patentholders to provide more
information to potential patent infringers than the "actual
notice" requirement articulated by the Federal Circuit.  (Id. at
14-15.)  Based on these conflicts, and as the Act lacks a
severability clause, Landmark asserts that the Act as a whole must
be held invalid.  (Id. at 15.)  NAPCO responds that the standard
of proof required under the Act is in fact severable and should be
severed to keep in place the valid provisions of the Act.  (Doc.
39 at 14-15.)  It further argues that the other grounds brought by
Landmark do not preempt the Act, even if the Act does not mirror

20

federal law, because the requirements under the Act may be "satisfied by showing the required federal analogue." (Id. at 12-14.) Meanwhile, the State of North Carolina, in its amicus brief, contends that the General Assembly intended to incorporate into the Act the standard required under federal law. (See Doc. 49 at 8-9.)

Under the Supremacy Clause, a state law may be preempted by federal statute. See U.S. CONST. art. VI, cl. 2; Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000). Even where Congress does not explicitly state that a federal statute preempts state law, a court may find state law preempted to the extent it conflicts with a federal statute or where Congress intended "to occupy the field." Crosby, 530 U.S. at 372. The former category, often termed "conflict preemption," occurs where "it is impossible for a private party to comply with both state and federal requirements" or "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Amgen, Inc. v. Sandoz Inc., 877 F.3d 1315, 1326 (Fed. Cir. 2017). To find state law conflicts with the purposes of a federal act, "a high threshold must be met," and the court should not conduct "a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 607 (2011) (plurality opinion) (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S.

21

88, 110 (1992) (Kennedy, J., concurring in part and concurring in judgment)). Further, "in a field which the States have traditionally occupied," the background assumption is "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Wyeth v. Levine, 555 U.S. 555, 565 (2009).

The Federal Circuit has stated that federal patent law neither explicitly preempts nor occupies the field pertaining to state unfair competition law. Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1332-33 (Fed. Cir. 1998), overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356 (Fed. Cir. 1999). As such, only conflict preemption is at issue here. Additionally, although patent law is the domain of the federal government, the Federal Circuit has explained that unfair competition law is primarily within the power of the states, and the court accordingly applies a presumption against preemption. See Hunter Douglas, 153 F.3d at 1333-34.

As discussed above, unless "the language of a statute is clear and unambiguous" such that "the courts must give it its plain and definite meaning," Lanvale Props., 731 S.E.2d at 809-10, North Carolina courts interpret statutes in line with the intent of the General Assembly "as gleaned from the language of the statute, the spirit of the statute and the purposes to be accomplished by the statute," Foremost Ins., 232 S.E.2d at 418; see also Dickson v.

22

Rucho, 737 S.E.2d 362, 368 (N.C. 2018) ("The primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent."). Further, North Carolina courts apply a presumption against construing a statute in a way that would make it unconstitutional and will "resolve all doubts in favor of [a statute's] constitutionality." State v. Mello, 684 S.E.2d 477, 479 (N.C. Ct. App. 2009), aff'd, 700 S.E.2d 224 (N.C. 2010).[6] These principles apply to the question of facial preemption presented here. See Bell Atlantic Md., Inc. v. Prince George's Cnty., 212 F.3d 865 (4th Cir. 2000) ("[W]hether a federal statute preempts a state statute . . . is a constitutional question."); Crosby, 530 U.S. at 388 (holding the application of a preempted law unconstitutional under the Supremacy Clause).

In promulgating the APAA, the General Assembly expressly stated that the Act was intended not to conflict with federal patent law. See, e.g., N.C. Gen. Stat. § 75-141(a)(3) (recognizing that "North Carolina is preempted from passing any law that conflicts with federal patent law"); id. § 75-141(a)(4) ("North Carolina wishes to help . . . by encouraging the most efficient

---

[6] North Carolina courts apply this presumption even in claims arising under the U.S. Constitution. See Mello, 684 S.E.2d at 479-81. The court is of course not bound by a state court's interpretation of the U.S. Constitution, but the state court's interpretation is relevant to the constitutional analysis "only insofar as it fixes the meaning of the regulation." Griffin v. Wisconsin, 483 U.S. 868, 875 (1987).

23

resolution of patent infringement claims without conflicting with federal law."); id. § 75-141(b) (explaining "[t]he General Assembly seeks . . . to strike a balance between (i) the interests of efficient and prompt resolution of patent infringement claims . . . and (ii) the intentions to respect federal law").

With these principles and background in mind, the court now considers the three grounds upon which Landmark contends the Act is preempted.

Landmark first contends that the Act is preempted because it is subject to a lower standard of proof than that required for bad faith claims under federal law. Federal patent law protects good faith representations of patent infringement, and the parties acknowledge that claims of bad faith infringement must be shown by clear and convincing evidence. Golan v. Pingel Enter., Inc., 310 F.3d 1360, 1371–72 (Fed. Cir. 2002).[7] By contrast, claims under the UDTPA may be proven by a preponderance of the evidence. See Ga. Pacific Consumer Prods., LP v. Drehle Corp., 618 F.3d 441, 457 (4th Cir. 2010). This standard is not articulated within the UDTPA but rather reflects the default standard applied to civil claims

_____

[7] While NAPCO acknowledges that Globetrotter Software, Inc. v. Elan Computer Grp., Inc., 362 F.3d 1367, 1377 (Fed. Cir. 2004) (citing Golan, 310 F.3d at 1371), is controlling on the standard of proof required under federal patent law, it reserves the right to argue on appeal that Globetrotter has been abrogated by Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 557 (2014) (holding that entitlement to attorneys' fees under federal patent law need not be shown by clear and convincing evidence). (Doc. 39 at 13 n.5.)

24

in North Carolina.  See Adams v. Bank of United of Tex. FSB, 606 S.E.2d 149, 154 (N.C. 2004).  This default standard does not apply where the legislature intends another standard of proof to apply.  See id.

Here, Landmark contends that the Act requires proof only by a preponderance of the evidence because it is codified within Chapter 75.  To be sure, the Act itself contains no provision as to an applicable standard of proof.  See N.C. Gen. Stat. §§ 75-140-145.  In light of the General Assembly's clear intention to avoid conflict with federal law, it is unlikely that the General Assembly intended the Act to be subject to a standard of proof that would clearly conflict with federal law.  As such, it is reasonable to conclude that the legislature did not intend that the Act be governed by the default preponderance of the evidence standard, but rather that it should be subject to the clear and convincing evidence standard required to avoid preemption under federal law.  This conclusion is strengthened by the fact that the Federal Circuit's 2002 opinion in Golan acknowledging the "clear and convincing" standard would have been well-known to the General Assembly by 2014 when it enacted the APAA as well as by the presumption against preemption and the canon that statutes will be interpreted in a manner to be found constitutional where possible.  Accordingly, the court interprets the Act as incorporating the

25

standard of proof required under federal law.[8]  Claims must therefore be shown by clear and convincing evidence.[9]

Landmark next contends that the Act is preempted because it interferes with the purposes and objectives of federal patent law because, first, the Act contains a non-exhaustive list of factors to consider in determining the existence of bad faith which are less rigorous than the "objectively baseless" standard required under federal law and, second, that the notice required by those factors exceeds the requirements of federal patent law.

At issue is § 143 of the Act, which contains a list of factors that "[a] court may consider . . . as evidence that a person has made a bad-faith assertion of patent infringement."  N.C. Gen.

---

[8] Because the court concludes that the General Assembly intended to incorporate the standard of proof required under federal law, the court does not engage in any "rewriting" of the statute.  See Cooper v. N.C. State Bd. of Elections, No. 5:08-CV-423-D, 2009 WL 9081691, at *10 (E.D.N.C. June 12, 2009) ("[A] federal court lacks power to rewrite state statutes.").

[9] Alternatively, NAPCO contends that the standard of proof under Chapter 75 is severable from the Act.  Where a statute contains both constitutional and unconstitutional provisions, North Carolina courts "sever the unconstitutional provisions and uphold the constitutional provisions to the extent possible."  State v. Singletary, 786 S.E.2d 712, 720 (N.C. Ct. App. 2016) (citing Fulton Corp. v. Faulkner, 481 S.E.2d 8, 10 (N.C. 1997)).  While absence of a severability clause may provide insight into the General Assembly's intent, it is not conclusive.  See Fulton, 481 S.E.2d at 10; Appeal of Springmoor, Inc., 498 S.E.2d 177, 185 (N.C. 1998).  Given the General Assembly's explicit intention that the Act be consistent with federal law, any standard of proof that would conflict with federal law would likely be considered severable.  Indeed, other courts in similar cases have found that "'completely eliminating the state law cause of action would do far greater violence to likely legislative expectations' than severing the standard of proof."  See Landmark Tech., LLC v. Azure Farms, Inc., No. 3:18-CV-1568-JR, 2020 WL 1430088, at *4 (D. Or. Mar. 24, 2020).

Case 1:21-cv-00025-TDS-LPA   Document 55   Filed 08/19/21   Page 26 of 62

Stat. § 75-143.  Included among these factors are a failure of the demand letter to contain certain information and factual allegations concerning the specific manner in which the target's product infringes on the patent; a failure of the person making the assertion to conduct an analysis comparing the claims in the patent to the target's product; a demand for payment of a license fee or response within an unreasonably short period of time; actual or constructive knowledge that the claim or assertion of patent infringement is meritless; and the fact that the claimant has sent substantially the same demand to multiple targets and against a wide variety of products without reflecting on those differences in a reasonable manner in the demands.  Id. § 75-143(a).  Landmark argues that these factors present a conflict in that the bad faith factors are more expansive than the objective bad faith standard articulated under federal law and that the suggested notice requirements are similarly too expansive.

A primary principle of federal patent law is that a patentee must be free to make its rights known to a potential infringer so that the latter can determine whether to cease its allegedly infringing activities, negotiate a lease, or choose to risk liability if the patent is enforced.  See, e.g., Hunter Douglas, 153 F.3d at 1336.  It is for this reason that federal patent law requires claims of bad faith assertion of patent infringement to be supported by both objective and subjective bad faith.  Id.

27

However, a state need not explicitly write into a statute the elements of objective and subjective bad faith to avoid preemption. See id. at 1336-37; Globetrotter Software, Inc. v. Elan Comput. Grp., Inc., 362 F.3d 1367, 1374 (Fed. Cir. 2004) ("[T]o avoid preemption, bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim." (internal quotation marks omitted)); see also Landmark Tech., LLC v. Azure Farms, Inc., No. 3:18-CV-1568-JR, 2019 WL 3763762, at *6 (D. Or. June 26, 2019) (incorporating federal objective baselessness and subjective bad faith standards into Oregon bad faith patent infringement prohibition), report and recommendation adopted in part, rejected in part, No. 3:18-CV-1568-JR, 2020 WL 1430088 (D. Or. Mar. 24, 2020); Puritan Med. Prod. Co. LLC v. Copan Italia S.p.A., 188 A.3d 853, 860-63 (Me. 2018) (same, interpreting Maine's Actions for Bad Faith Assertion of Patent Infringement statute); Summer Infant (USA), Inc. v. TOMY Int'l, Inc., No. CV 17-549MSM, 2019 WL 5540224, at *2-3 (D.R.I. Oct. 25, 2019) (same, interpreting Rhode Island's bad faith assertions of patent infringement statute and stating that "courts have consistently found that claims based on the state-law bad faith standard are preempted, unless the claimant presents sufficient evidence to allow a fact-finder to determine that the assertion of patent infringement was both objectively baseless and made in subjective

28

bad faith").[10]

Although Landmark argues that the Act's bad faith factors interfere with the objectives and purposes of federal patent law, this does not appear to be the case. Another court analyzed a similar statute under Oregon law which contained a nearly identical list of factors to consider in determining the existence of bad faith. See Landmark Tech., LLC v. Azure Farms, Inc., No. 3:18-CV-1568-JR, 2020 WL 1430088, at *5 (D. Or. Mar. 24, 2020). There, the court found that the factors did not interfere with federal law because they were non-exhaustive, the court was not required to consider them, and they could inform a court's determination of subjective bad faith rather than objective baselessness. See id. For these same reasons, the Act's bad faith factors – including those relating to notice – do not interfere with the purposes of federal patent law. The list of factors here "may" be considered by the court, but the court is permitted to consider "[a]ny other factor the court finds relevant." N.C. Gen. Stat. § 75-143(a)(12). As such, the factors – including the suggested notice requirements – are not mandatory requirements for individuals asserting patent infringement and do not present a clear conflict with federal law.

To the extent Landmark argues that the Act broadens the objective bad faith inquiry beyond the "objectively baseless"

---

[10] To the extent Landmark contends that NAPCO has failed to plausibly plead these requirements, those arguments are addressed, infra.

requirement under federal law, this argument is meritless.  The
Act contains factors to consider in finding "bad faith" but does
not specify that these factors show <u>objective</u> bad faith.  Rather,
these factors may be considered in relation to the subjective bad
faith inquiry permitted under federal law without presenting any
conflict.  In light of the General Assembly's intent not to
conflict with federal law and the canon that statutes will be
interpreted in a manner that is constitutional where possible, the
court concludes that these factors relate to subjective bad faith,
rather than objective baselessness, and the statute is not
preempted on those grounds.[11]

   **b.   Failure to plead consistent with federal law**

     Even if the Act is not wholly preempted, Landmark argues,
NAPCO has failed to plead its claim consistent with federal law in

_____

[11] Landmark's reliance on <u>Eubanks v. Wilkinson</u>, 937 F.2d 1118 (6th Cir.
1991), for its argument that the incorporation of the requirements of
federal patent law constitutes an impermissible rewriting of the Act is
misplaced.  In that case, the district court found that language used
in a state statute was unconstitutionally vague and supplied new limiting
language for the statute.  <u>See id.</u> at 1121.  The Sixth Circuit found
this selection of entirely new language by the district court infringed
on the powers of the state legislature.  <u>See id.</u> at 1127.  Landmark also
cites to <u>United States v. Sims</u> where the Fourth Circuit declined to adopt
a reading of a statute that "directly conflict[ed] with how courts and
the United States itself" had interpreted it.  914 F.3d 229, 252 (4th
Cir. 2019).  Here, the court does not supply any additional language to
the Act but rather interprets the General Assembly's intention in
prohibiting "bad faith" assertions of patent infringement in line with
the language of the statute.  As discussed <u>supra</u>, this interpretation
is consistent with the applicable precedent of the Federal Circuit and
with the interpretations of other courts construing similar statutes.
Accordingly, Landmark's contention that upholding the Act requires the
court to engage in rewriting it is meritless.

two respects. First, it argues that NAPCO has failed to plausibly plead both "objective baselessness" and "subjective bad faith," as required by federal patent law. (Doc. 18 at 10-12.) Second, it contends that NAPCO's claim is barred by the Noerr-Pennington doctrine. (Id. at 13.) Landmark further argues that the claim should be dismissed as premature. (Id. at 12; Doc. 53 at 9-10.) NAPCO, in turn, argues that it has sufficiently pleaded both "objective baseless" and "subjective bad faith" and that Noerr-Pennington does not apply because it has sufficiently alleged that Landmark's petitioning activity is a "sham." (Doc. 39 at 15-18.) It further argues that the claim should not be dismissed as premature as it has plausibly pleaded its claim, as required at the present stage. (Id. at 18.)

### i. Bad faith allegations

"[F]ederal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." Globetrotter, 362 F.3d at 1374 (citing Zenith Elecs. Corp. v. Exzec, Inc., 182 F.3d 1340, 1355 (Fed. Cir. 1999)). "State-law claims [] can survive federal preemption only to the extent that those claims are based on a showing of 'bad faith' action in asserting infringement." Id. (citing Zenith, 182 F.3d at 1355). "Accordingly, to avoid preemption, 'bad faith must be alleged and ultimately proven, even if bad faith is not otherwise

31

an element of the tort claim.'"  Id. (citing Zenith, 182 F.3d at 1355).  To make a claim of bad faith under federal patent law, a party must plead both objective and subjective bad faith.  See id. at 1374-75.  The parties agree as much.  (See Docs. 18, 39.)  The only issue is whether NAPCO has sufficiently pleaded bad faith here.

The Federal Circuit has explained that objective bad faith is satisfied where the claim is objectively baseless "in the sense that no reasonable litigant could realistically expect success on the merits."  See Globetrotter, 362 F.3d at 1376.  Whether such a claim meets this standard is determined on a case-by-case basis.  See Zenith, 182 F.3d at 1354.  "In general, a threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith in the communication of information about the existence or pendency of patent rights."  Golan, 310 F.3d at 1371 (internal citation omitted); c.f. Matthews Int'l Corp. v. Biosafe Eng'g, LLC, 695 F.3d 1322, 1332 (Fed. Cir. 2012) ; see also Zenith, 182 F.3d at 1354 ("Obviously, if the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith is made out.").  Meanwhile, the subjective component requires a showing that the patentee demonstrated subjective bad faith in enforcing its patent.  Globetrotter, 362 F.3d at 1375.  Under federal law, in order to

seek to protect patent rights, patentholders "are allowed to make representations that turn out to be inaccurate provided they make them in good faith." <u>Golan</u>, 310 F.3d at 1371.

NAPCO contends that objective bad faith is established based on its allegations that Landmark "knew, and should have known, that the claims as reasonably construed could not possibly cover NAPCO's products, services, and technology," that NAPCO's services and websites do not infringe the subject patent because they do not practice every limitation of the independent claims, and that NAPCO does not own or control the servers alleged to infringe the patent. (Doc. 39 at 16.) Notably, NAPCO's complaint states that "any reasonable investigation of the website, including by purchasing a single product through the website, would have revealed that it does not infringe any valid claim" of the '508 patent. (Doc. 15 ¶ 107.)

Other courts have found that a failure to conduct a reasonable investigation may constitute objective bad faith. <u>See, e.g.</u>, <u>Reid-Ashman Mfg., Inc. v. Swanson Semiconductor Serv., L.L.C.</u>, No. C-06-4693, 2007 WL 1394427, at *9 (N.D. Cal. May 10, 2007) (finding bad faith adequately pleaded where complaint alleged that patentee had never adequately inspected the accused product prior to suit and pictures patentee took of allegedly infringing product were of a prototype rather than of the product); <u>Triple7Vaping.com, LLC v. Shipping & Transit LLC</u>, No. 16-CV-80855, 2017 WL 5239874, at *7

33

(S.D. Fla. Feb. 6, 2017) (finding allegations, including "that a reasonable investigation . . . by purchasing a single product from the Website[] would have revealed that the Website does not infringe S&T's patents," sufficient to show objective baselessness); Veolia Water Sols. & Techs. N. Am., Inc. v. Aquatech Int'l Corp., 123 F. Supp. 3d 695, 701 (W.D. Pa. 2015) (finding bad faith sufficiently alleged where company "conducted no investigation, analysis, or review prior to sending" demand letter and emails showed knowledge that process could not infringe subject patent); see also Nuance Commc'ns, Inc. v. MModal LLC, No. CV 17-1484-MN-SRF, 2018 WL 6804488, at *4 (D. Del. Dec. 27, 2018) (finding objective baselessness alleged where party's "non-infringement allegations detail elements of the Asserted Patents that are not met in the accused product"), report and recommendation adopted, No. CV 17-1484 (MN), 2019 WL 181322 (D. Del. Jan. 11, 2019).

Here, NAPCO has alleged that its technology does not infringe Landmark's patent and that Landmark failed to engage in a basic investigation by purchasing a single item from the website which would have revealed that the website does not infringe Landmark's patent. If true, this would constitute objective bad faith by demonstrating Landmark's disregard for the correctness of its

34

allegations.[12]  As such, at this early stage, NAPCO has alleged sufficient facts to support a finding of objective baselessness.

To the extent Landmark contends NAPCO failed to plead subjective bad faith, this argument fails.  Not only has NAPCO alleged that Landmark failed to conduct a basic investigation that would have revealed NAPCO's non-infringement, it has also alleged that Landmark engaged in a pattern of meritless litigation against various entities and has attempted to force quick settlements, based on the in terrorem effect of its demands, without any intent of litigating its claims.  See Eon-Net LP v. Flagstar Bancorp, 653 F.3d 1314, 1326 (Fed. Cir. 2011) (affirming district court's finding of subjective bad faith where plaintiff's case "had 'indicia of extortion' because it was part of [plaintiff]'s history of filing nearly identical patent infringement complaints against a plethora of diverse defendants, where [plaintiff] followed each filing with a demand for a quick settlement at a price far lower than the cost to defend the litigation").  Notably, the demand letter here offered a licensing fee of $65,000 available for a period of approximately two weeks and which would "not be available in the event of litigation."  (See Doc. 1-1 at 3.)  In light of these allegations, NAPCO has alleged sufficient facts to plausibly plead subjective bad faith.  Accordingly, Landmark's motion to

_____

[12] Whether Landmark's investigation was adequate is a question of fact not suitable for resolution at the current stage.

35

dismiss on these grounds will be denied.

## ii. **Noerr-Pennington** immunity

Landmark next contends that the communications within its demand letter are protected by Noerr-Pennington immunity. In response, NAPCO argues that it has sufficiently alleged that Landmark is engaged in "sham litigation" such that it cannot benefit from such immunity.

The Petition Clause of the First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." The Supreme Court has recognized the "right to petition as one of 'the most precious of the liberties safeguarded by the Bill of Rights[.]'" BE & K Constr. Co. v. NLRB, 536 U.S. 516, 524 (2002) (quoting United Mine Workers v. Ill. Bar Ass'n, 389 U.S. 217, 222 (1967)). "The Noerr-Pennington doctrine grants First Amendment immunity to those who engage in petitioning activity." IGEN Int'l, Inc. v. Roche Diagnostics GMBH, 335 F.3d 303, 310 (4th Cir. 2003) (emphasis in original) (citing United Mine Workers of Am. v. Pennington, 381 U.S. 657, 670 (1965), and E. R.R. President's Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 138 (1961)). This doctrine has been extended to certain pre-litigation conduct, including demand letters. See Glass Equip. Dev., Inc. v. Besten, Inc., 174 F.3d 1337, 1344 (Fed. Cir. 1999); see also Globetrotter, 362 F.3d at 1376 (indicating Noerr-

36

_Pennington_ immunity applies to pre-litigation communications alleging patent infringement). To overcome this presumptive immunity, a plaintiff must establish that the defendant's instigation of litigation was merely a "sham." _Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc._, 508 U.S. 49, 60 (1993) ("PRE"); see also _Globetrotter_, 362 F.3d at 1377 (applying _PRE_ sham exception in the context of pre-suit communications alleging patent infringement). The two-part test articulated in _PRE_ requires the plaintiff to show not only that the litigation was objectively baseless, but also that the defendant subjectively intended to harm the plaintiff through the abuse of the governmental process itself, as opposed to harms flowing from the outcome of that process. See _PRE_, 508 U.S. at 60-61.

For the reasons already noted, NAPCO has sufficiently alleged that Landmark's demand letter was objectively baseless and brought in subjective bad faith by relying on the threat of litigation to extract a quick settlement. These same allegations sufficiently support NAPCO's contention that the demand letter was a "sham." Whether such allegations ultimately are supported, such that Landmark cannot avail itself of _Noerr-Pennington_ protection, is not appropriate for consideration at the current stage. See _Hoffman-La Roche, Inc. v. Genpharm, Inc._, 50 F. Supp. 2d 367, 380 (D.N.J. 1999) (declining to find _Noerr-Pennington_ immunity on a motion to dismiss because "reasonableness is a question of fact").

37

Accordingly, Landmark's motion to dismiss based on Noerr-Pennington protection will be denied at this time.

### iii. Prematurity

Landmark argues, in the alternative, that this claim should be dismissed because it is premature in that the success of the claim ultimately is dependent upon a finding of NAPCO's non-infringement. (Doc. 18 at 12; Doc. 53 at 9-10.) NAPCO argues that dismissal on this ground is inappropriate because it has plausibly alleged its claim as required at the present stage. (Doc. 39 at 18.)

Although it is true that the success of NAPCO's APAA claim is dependent on the court finding that it did not infringe Landmark's patent, see Globetrotter, 362 F.3d at 1375 (objective baselessness requires no reasonable expectation of success on the merits), dismissal is premature. See, e.g., Gleason Works v. Oerlikon Geartec, AG, 141 F. Supp. 2d 334, 338-39 (W.D.N.Y. 2001) (deferring decision on, but not dismissing, claim of bad faith patent infringement, explaining "the motion [for summary judgment] is premature because it would be more productive and less wasteful to consider the unfair competition counts after the primary issues of infringement and validity have been addressed"); but see Azure Farms, 2019 WL 3763762, at *7 ("Because plaintiff argues that new assertions of objective baselessness are contravened by . . . the '319 patent, assuming the statute itself is not preempted, the

38

Court should dismiss the claim without prejudice and thus allow for allegations after the claim construction process."). Were the court to dismiss this claim and require NAPCO to first bring suit solely on the validity of the patent, it would amount to a functional prerequisite to suit that prospective litigants must first successfully defend against a bad faith claim of patent infringement. Requiring two separate proceedings would circumvent the intentions of the General Assembly, which explicitly sought to minimize "the threat of expensive and protracted [patent] litigation." N.C. Gen. Stat. § 75-141(a)(6). Although the court may later determine that NAPCO's other claims must be resolved prior to consideration of the APAA claim, see, e.g., Fitbit, Inc. v. Aliphcom, No. 5:15-CV-04073-EJD, 2016 WL 7888033, at *2 (N.D. Cal. May 27, 2016) (bifurcating proceedings and staying antitrust claim until determination of the validity of the patent infringement claims), the APAA claim will not be dismissed on these grounds at this time.

### 4. Constitutional Challenges

Lastly, Landmark contends that the Act violates the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the dormant Commerce Clause. (Doc. 18 at 16-19.) Each claim is addressed in turn.

### a. First Amendment

Landmark claims that the Act violates the First Amendment in

39

two respects: first, that it imposes an unconstitutional content-based restriction on speech and, second, that it unconstitutionally compels speech. (Doc. 18 at 16-18.) This is a facial challenge to the Act. In raising such a challenge, Landmark confronts a "heavy burden." Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998). The Supreme Court has repeatedly stated that facial invalidation of legislation is disfavored. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008); Nat'l Endowment for the Arts, 524 U.S. at 580 (noting facial invalidation "has been employed by the Court sparingly and only as a last resort"); FW/PBS, Inc. v. Dallas, 493 U.S. 215, 223 (1990) ("[F]acial challenges to legislation are generally disfavored.").

### i. Content-based restriction on speech

Landmark contends that the Act is a content-based restriction on speech in that it targets speech – here, assertions of patent infringement – based on its communicative content and should therefore be subjected to strict scrutiny. (See Doc. 18 at 16; Doc. 53 at 12-13.) It further argues, looking at the number of entities that are exempted from the Act, that the law fails strict scrutiny analysis because it is underinclusive for achieving its stated goal. (Doc. 18 at 16-17.) NAPCO replies that the law is not content-based because it does not apply to all assertions of

40

patent infringement, but rather only those made in bad faith.[13] (Doc. 39 at 18-19.)  It further contends that even if the Act were considered content-based, it is properly tailored to "include only those entities that lack the capitalization necessary to fear a post-suit judgment."  (Id. at 20.)

The threshold inquiry is whether the Act regulates protected speech.  Courts have long distinguished between protected expression and economic activity or, more generally, non-expressive conduct.  Sorrell v. IMS Health, 564 U.S. 552, 567 (2011).  "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."  Id.  For example, it is permissible for antitrust laws to prohibit "agreements in restraint of trade."  See Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949).  "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  Id.

Here, it is unclear whether the Act is properly characterized

---

[13] Citing Globetrotter, 362 F.3d at 1377, NAPCO also contends that the Act does not violate the First Amendment because the Federal Circuit has already indicated that tort liability may be imposed on bad faith pre-suit patent infringement assertions, "rest[ing] both on federal preemption and the First Amendment."  (Doc. 39 at 20.)  However, Globetrotter addressed the right to petition under the First Amendment, which is a separate consideration from whether laws expressly prohibiting such assertions are unconstitutional content-based restrictions on speech.  As such, the court does not address that argument here.

Case 1:21-cv-00025-TDS-LPA   Document 55   Filed 08/19/21   Page 41 of 62

as regulating speech or economic activity. While the Act addresses "assertions of patent infringement" – which is ostensibly speech – the Act only applies to "bad faith" assertions of patent infringement – which could instead be considered conduct. Unfortunately, neither party addresses this issue. Regardless, the court need not decide this issue because even if the Act is considered to regulate speech, it nevertheless passes constitutional muster.

Content-based restrictions on speech – those restrictions that target speech based on its communicative content – are presumptively unconstitutional, and such laws are subject to strict scrutiny. Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163-64 (2015). However, the First Amendment's protection of speech is not absolute. See United States v. Stevens, 559 U.S. 460, 468 (2010). The Supreme Court has "permitted restrictions upon the content of speech in a few limited areas" that contain "constitutionally proscribable content," including obscenity, defamation, incitement, speech integral to criminal conduct, and fraud. See id. (internal quotations omitted); R.A.V. v. City of St. Paul, 505 U.S. 377, 383-84 (1992). Although content-based restrictions trigger strict scrutiny even where the speech falls within one of these unprotected categories, "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable," strict

42

scrutiny is not applied.  See R.A.V., 505 U.S. at 388.  In such cases, however, as "the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn . . . the statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression."  Gooding v. Wilson, 405 U.S. 518, 522 (1972).  "In other words, . . . '[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'"  Id. (quoting NAACP v. Button, 371 U.S. 415, 433 (1963)).  Where speech is unprotected, statutes regulating such speech are subject to rational basis review.  See Ripplinger v. Collins, 868 F.2d 1043, 1057 (9th Cir. 1989) ("We apply a rational basis test . . . because the statute regulates only unprotected speech.").  Under the rational basis standard, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).

As a general rule, false speech is not categorically unprotected.  See United States v. Alvarez, 567 U.S. 709, 722 (2012).  However, "[w]here false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of employment, it is well established that the Government may restrict

43

speech without affronting the First Amendment." Id. (citing Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 771-72 (1976)). Said another way, a false statement associated with some form of "legally cognizable harm" may be subject to restrictions consistent with the First Amendment. See id. at 719. However, falsity of statement alone is not sufficient – "[t]he statement must be a *knowing or reckless* falsehood." Id. at 719. Accordingly, in order to permissibly regulate false speech, statutes must be drafted or construed narrowly such that they apply only to knowing or reckless false statements made to effectuate a legally cognizable harm.

Here, the Act does not regulate all assertions of patent infringement but only "bad faith" ones. The Act specifies that bad-faith infringement claims can harm North Carolina companies by coercing businesses "to settle and to pay a licensing fee even if the claim is meritless." N.C. Gen. Stat. § 75-141(a)(6). In this sense, the Act is akin to those regulating fraudulent statements and, indeed, was enacted to prevent companies from being taken advantage of by another's wrongful assertions of patent infringement. Given this, the Act proscribes certain communications containing specific content precisely because of the "distinctively proscribable content" of that communication. As such, strict scrutiny should not be applied; rather, the Act must be "carefully drawn or be authoritatively construed" to ensure

44

it addresses only unprotected speech.  <u>Gooding</u>, 405 U.S. at 522.
As long as the Act meets this standard, it is subject to rational
basis review.  <u>See</u> <u>Ripplinger</u>, 868 F.2d at 1057.

Viewed as a statute addressing false statements, the Act
adheres to First Amendment precedent.  Because under federal patent
law a claim of a bad faith assertion must be supported by both
"objective baselessness" and "subjective bad faith," even if not
explicitly written into the state law, claims may be brought under
the Act only if there is no reasonable expectation of success on
the merits of the infringement claim and the individual asserting
infringement knew or should have known that the claim had no
reasonable expectation of success.  Further, as the discussed
above, the Act requires that a person or target be "aggrieved" by
the violation, constituting a cognizable legal harm.  Further, the
Act does not encroach on a patentholder's rights to assert
infringement of its patents.  All such assertions are permissible
as long as they are not made in bad faith, as discussed <u>supra</u>.[14]

---

[14] As the court finds that the speech at issue falls within an unprotected
category of speech and is based upon the proscribable nature of its
content, strict scrutiny is not applied and the court need not consider
Landmark's argument that the law is not narrowly tailored due to the
number of entity classes exempted from the Act.  (<u>See</u> Doc. 18 at 16-17);
<u>see also</u> <u>Auburn Police Union v. Carpenter</u>, 8 F.3d 886, 899 n.18 (1st
Cir. 1993) (examining whether a law challenged under both the First and
Fourteenth Amendments is unconstitutionally underinclusive and stating,
"[w]hen reviewing content-based distinctions, the Supreme Court has not
differentiated the Equal Protection Clause from the First Amendment").
The court examines, <u>infra</u>, whether these class exemptions cause the Act
to fail rational basis scrutiny.

Based on this construction of the statute, the court finds that the Act addresses only unprotected speech, consistent with First Amendment precedent concerning the protection of false statements, and is therefore subject to rational basis review. Prior to engaging in this analysis, however, the court considers Landmark's remaining arguments to determine whether a heightened standard of scrutiny should apply based upon another theory.

### ii. Unconstitutionally compelled speech

Landmark next argues that the Act unconstitutionally compels speech on the part of patentholders by allowing courts to find holders act in "bad faith" if they omit certain information from a demand letter. (Doc. 18 at 17-18.) In response, NAPCO argues that the Act merely provides a "framework" that courts may utilize – but are not required to utilize – in evaluating claims and that, as consideration of the factors listed is discretionary, the Act does not compel patentholders to speak in any particular manner. (Doc. 39 at 20-21.) It further argues that the framework does not interfere with the message of patent infringement conveyed. (Id.)

Compelled speech is considered a form of content-based regulation on speech and therefore, if speech is compelled under a statute, the statute is subject to strict scrutiny. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt., 721 F.3d 264, 283 (4th Cir. 2013) ("[The] strict scrutiny standard generally applies to content-based regulations, including

46

compelled speech.").

Landmark contends that the Act compels speech based on § 75-143, which indicates that "[a] court may consider" whether a demand contains certain information "as evidence that a person has made a bad-faith assertion of patent infringement."[15]  See N.C. Gen. Stat. § 75-143(a).  This section also indicates that "a court may consider" the fact that a demand contains the specified information "as evidence that a person has not made a bad-faith assertion of patent infringement." Id. § 75-143(b).  Notably, neither provision requires that an individual disclose the specified information in an assertion of patent infringement.  Rather, the absence of such information constitutes one of eleven defined factors that a court "may" consider in determining the existence of bad faith.  The court is also permitted to consider "[a]ny other factor the court finds relevant." Id. § 75-143(a)(12).

Based on the language of these provisions alone, the Act does not compel speech of any manner but rather provides a number of factors a court may consider before making a finding of bad faith.  And although the disclosure of certain information may be

---

[15] The Act indicates that a court may consider whether a "demand does not contain all of the following information" as evidence of bad faith: the patent application number or patent number; the name and address of the patent owner or assignee; "[f]actual allegations concerning the specific areas in which the target's products, services, and technology infringe the patent or are covered by specified, identified claims in the patent;" and an explanation of why the person making the assertion has standing if they are not identified as the owner.  N.C. Gen. Stat. § 75-143(a)(1).

47

considered, it is possible for a court to make a finding of bad faith even when such information is provided, and the reverse is true as well.  See id. § 75-143(a)-(b).  Landmark does not cite, nor has the court been able to locate, any prior case in which a statute's discretionary factors have been construed as compelling speech.

Because the Act does not require any particular speech and, indeed, patentholders remain free to make assertions of patent infringement with or without the listed information, the court finds that the Act does not unconstitutionally compel speech in violation of the First Amendment.  The Act is therefore not subject to heightened scrutiny on these grounds.

### b.  Equal Protection Clause

Landmark next argues that the Act violates the Equal Protection Clause of the Fourteenth Amendment by irrationally policing bad faith patent infringement claims by non-operating entities while exempting other organizations, including "operating entit[ies]," "institution[s] of higher learning," "technology transfer organization[s]," and "nonprofit research organization[s]," from the Act.  (Doc. 18 at 18.)  NAPCO responds that the categorization of exempt and non-exempt organizations is rational in light of the Act's specific purpose of addressing abusive patent assertions by entities who "hold no cash or other assets."  (Doc. 39 at 22.)  Moreover, it contends that this claim

48

is a mere repackaging of Landmark's First Amendment claim and should be dismissed on that basis alone. (Id. at 22-23.)

In evaluating an equal protection claim, the court must first determine the proper standard of scrutiny to apply. The Supreme Court has "long held that a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." Armour v. City of Indianapolis, Ind., 566 U.S. 673, 680 (2012) (internal quotation marks omitted). In other words, such claims are subject to the rational basis test. See id. However, classifications involving fundamental rights or suspect classes are subject to strict scrutiny. See id. Although Landmark contends this claim should be reviewed under strict scrutiny because the Act is a content-based restriction on speech, thereby involving a fundamental right (see Doc. 18 at 18); see also Cent. Radio Co. Inc. v. City of Norfolk, Va., 811 F.3d 625, 633 (4th Cir. 2016), the court has rejected that argument. As Landmark has failed to establish that a higher standard of scrutiny should apply to the Act under either the First or Fourteenth Amendments, the court reviews the Act under the rational basis test.

The rational basis test is highly deferential. See Adkins v. Rumsfeld, 464 F.3d 456, 469 (4th Cir. 2006). Under this standard,

49

"[a] challenged state action will survive . . . if it is rationally related to legitimate government interests." Cap. Associated Indus. Inc. v. Stein, 283 F. Supp. 3d 374, 383 (M.D.N.C. 2017). The test requires that the court determine "(1) whether the purpose that animates [the challenged] laws and regulations is legitimate, and (2) whether it was reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose." Adkins, 464 F.3d at 469 (internal quotations and citations omitted) (alterations in original). Further, "[s]tates are accorded wide latitude in the regulation of their local economies under the police powers, and rational distinctions may be made with substantially less than mathematical exactitude." New Orleans v. Dukes, 427 U.S. 297, 303 (1976). "[W]here ordinary commercial transactions are at issue, rational basis review requires deference to reasonable underlying legislative judgments." Armour, 566 U.S. at 680. And "although the legislative findings and declaration of policy have no magical quality to make valid that which is invalid, and are subject to judicial review, they are entitled to weight in construing the statute." Hest Techs., Inc. v. State ex rel. Perdue, 749 S.E.2d 429, 433 (N.C. 2012).

Landmark contends that the Act cannot survive rational basis review because various classes of patentholders are exempt from

50

the Act, including "operating entit[ies],"[16] "institution[s] of higher learning," "technology transfer organization[s]," and "nonprofit research organization[s]." (Doc. 18 at 18.) Landmark argues that "[s]ince the Act's stated purpose is to protect North Carolina citizens from 'bad faith' assertions of patent infringement, this disparate treatment of different categories of patent owners makes no rational sense, since virtually all U.S. patents are owned by so-called 'operating' entities." (Id.)

Landmark misstates the full extent of the Act's purpose. The Act is not solely geared toward preventing bad faith assertions of patent infringement, but rather seeks to prohibit a specific class of such assertions. The General Assembly expressly recognized that in lawsuits involving abusive patent assertions prior to the passage of the Act, wrongly accused defendants were already able to recover costs and fees following litigation in certain circumstances. See N.C. Gen. Stat. § 75-141(a)(9); see also 35 U.S.C. § 285 (allowing prevailing defendants in patent infringement actions to recover costs and attorneys' fee awards in "exceptional cases"). However, the General Assembly noted it acted out of a concern that these preexisting remedies did "not serve as

_____

[16] The Act defines operating entities to include a person primarily engaged in, over the preceding 24-month period, "research and technical or experimental work to create, test, qualify, modify, or validate technologies or processes for commercialization of goods or services; manufacturing; or the provision of goods or commercial services," disregarding the selling and licensing of patents. N.C. Gen. Stat. § 75-142(5).

a deterrent to abusive patent assertion entities who have limited liability, as these companies may hold no cash or other assets." N.C. Gen. Stat. § 75-141(a)(9). As such, the legislature stated it was specifically focusing the Act on preventing bad faith assertions of patent infringement by entities that lack cash or other assets, as these entities were unlikely to be deterred from preying on local businesses by preexisting law. The desire to prevent such remediless abuse, as well as to avoid the ensuing cost to local businesses and the state economy as a whole, is a legitimate purpose.

The court must next consider whether it was reasonable for the lawmakers to believe that excluding various groups from the Act would promote that purpose. Excluded under the Act are demand letters or assertions of patent infringement from operating entities, institutions of higher education, nonprofit research organizations, and technology transfer organizations owned by or affiliated with institutions of higher education or nonprofit research organizations. N.C. Gen. Stat. § 75-143(c). In crafting these exclusions, the General Assembly sought to tailor liability under the Act to entities that do not have cash or other assets that would be available in the event of an adverse judgment in litigation under preexisting patent law. Certainly, the fact that operating entities, as defined by the Act, must be actively involved in activities demanding some measure of assets – such as

52

manufacturing, research, or the provision of goods and services –
aligns with this goal.  See N.C. Gen. Stat. § 75-142(5).
Similarly, it is not unreasonable for the General Assembly to
conclude that institutions of higher education and nonprofit
research organizations, as well as entities affiliated with them,
are sufficiently capitalized to be deterred from making bad faith
assertions of patent infringement by preexisting patent law.  In
determining the appropriate groups for exclusion, the General
Assembly attempted to isolate a group that may be undercapitalized
and undeterred by the prior legal status quo.  The Act, as written,
does not appear unreasonable for that purpose.[17]

### c.  Dormant Commerce Clause

Finally, Landmark argues that the Act violates the dormant
Commerce Clause in that it provides special protections to "North
Carolina person[s]" accused of patent infringement, amounting to
"simple economic protectionism." (Doc. 18 at 19.)  NAPCO contends
that the Act is facially neutral as it does not make any
distinction between in-state and out-of-state persons when
considering who may make a bad-faith assertion of patent

---

[17] To the extent Landmark contests the utility of a statute focused on
non-practicing entities for the purpose of reducing bad faith patent
assertions (see Doc. 54 at 17-21 (contesting multiple issues, including
whether non-practicing entities bring less meritorious patent claims)),
these arguments are unpersuasive in light of the court's conclusion that
the purpose of the Act is to reduce bad faith patent assertions
specifically by entities with limited assets.  Further, the mere fact
that there is research supporting both sides of an argument does not
alone render the General Assembly's judgment unreasonable.

infringement or whether such an assertion has been made. (Doc. 39 at 24.) It further contends that the Act does not burden the flow of interstate commerce and that, regardless, Landmark lacks standing as a North Carolina entity to raise this claim.[18] (Id. at 25.)

The Commerce Clause of the U.S. Constitution empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. CONST. art. I, § 8. Although "phrased

---

[18] Although courts should avoid ruling on constitutional issues where a case may otherwise be dismissed on standing grounds, see Ashwander v. TVA, 297 U.S. 288, 345-48 (1936) (Brandeis, J., concurring) (offering the standing requirement as one means by which courts avoid unnecessary constitutional adjudications), the court cannot reach a conclusion on the issue of standing based on the briefing before it. Neither party addresses the applicable legal standard. (See Docs. 39, 53.) Moreover, NAPCO does not specify whether its argument is based on Article III standing or prudential standing grounds. (See Doc. 39 at 25-26.) In fact, its whole argument regarding standing is presented in a single sentence. (See id. ("Finally, Landmark lacks standing as a North Carolina entity to raise this claim.")); see also M.D.N.C. L.R. 7.2(a) (requiring opening briefs, response briefs, and reply briefs to contain the party's argument "which shall refer to all statutes, rules and authorities relied upon"). Landmark defends its standing by claiming it is within the "zone of interests" protected by the dormant Commerce Clause. (See Doc. 53 at 15.) However, the Supreme Court has indicated that the "zone of interest" analysis does not pertain to standing at all but rather reflects a statutory inquiry. Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014). After Lexmark, it is unclear whether the "zone of interest" test remains applicable to Landmark's dormant Commerce Clause challenge. See Sierra Club v. Trump, 929 F.3d 670, 701-02 (9th Cir. 2019) (questioning the applicability of the "zone of interest" test to dormant Commerce Clause claims, explaining that "[e]ven if a zone of interests test may have been applied to some cases considering constitutional claims . . . prior to Lexmark, we think that Lexmark has called into question its continuing applicability to constitutional claims"). As the briefing on this issue is insufficient and presents a risk of confusing the issues before the court, the court will proceed directly to the content of the dormant Commerce Clause challenge.

54

as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." Or. Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 98 (1994). Thus, with certain exceptions, the so-called "dormant" Commerce Clause prohibits states from discriminating against the free flow of interstate commerce. Underpinning this doctrine is "concern about 'economic protectionism, that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 337-38 (2008) (quoting New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273-74 (1988)).

Courts apply a two-step inquiry to state laws challenged under the dormant Commerce Clause. First, a court "inquires whether the state law *discriminates* against interstate commerce." Brown v. Hovatter, 561 F.3d 357, 363 (4th Cir. 2009) (emphasis in original). If the law is discriminatory facially or in practical effect, it is "virtually per se invalid," unless the "discrimination is demonstrably justified by a factor unrelated to economic protectionism." Id. (internal citations omitted). However, if the state law has an impact on interstate commerce but is neither discriminatory on its face nor in practical effect, the court next considers "whether the state law[] 'unjustifiably . . . burden[s]

55

the interstate flow of articles of commerce.'" Id. (quoting Or. Waste Sys., 511 U.S. at 98). Under this analysis, a state law will be upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). "In determining whether a statute has 'a legitimate local purpose' and 'putative local benefits,' a court must proceed with deference to the state legislature." Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc., 401 F.3d 560, 569 (4th Cir. 2005).

Here, Landmark contends that the Act is both facially discriminatory and discriminatory in its practical effect. Landmark contends that "the Act facially discriminates between N[APCO] and its out-of-state competitors because – by imposing the specter of liability on patent owners asserting infringement against North Carolina companies – the Act discourages interstate patent licensing." (Doc. 53 at 15.) However, Landmark does not cite to any provision of the Act that operates as described, and the court cannot discern any such provision. While the Act defines a "target" as a "North Carolina person," N.C. Gen. Stat. § 75-142(6), the Act makes it generally "unlawful for a person to make a bad-faith assertion of patent infringement," id. § 75-143(a), and "[a] target *or person aggrieved by a violation of this Article* . . . may bring an action" under the Act, id. § 75-145(b) (emphasis

56

added).  By the terms of the Act, the right to bring civil actions under the Act is not limited to North Carolina persons but may include anyone aggrieved by bad faith assertions of patent infringement, meaning that an actor could incur liability from assertions against both in-state and out-of-state entities. Moreover, both in-state and out-of-state patentholders may equally incur liability under the Act.  As such, the Act does not facially discriminate against interstate commerce.  While the parties, and thus the claim, must still fall within the personal jurisdiction of North Carolina courts, the Act itself does not differentiate between claims based upon the residency of the claimant.  But see id. § 75-144(a) (allowing only "target[s]" to move for a pre-judgment bond).  Further, Landmark provides no argument as to how the Act is discriminatory in its application.  Accordingly, the court does not find the Act to discriminate against interstate commerce, either facially or in practical effect.

As the Act is nondiscriminatory, the court must next consider whether the it "unjustifiably . . . burden[s] the interstate flow of articles of commerce."  Or. Waste Sys., 511 U.S. at 98.  In so doing, the court considers whether the Act has a legitimate local purpose and weighs the local benefits of the Act against any burdens it imposes on interstate commerce.  See Yamaha, 401 F.3d at 569.  As discussed above, the Act is designed to prevent bad faith assertions of patent infringement by entities with limited

57

resources. The Act accomplishes this purpose by allowing individuals accused of patent infringement in bad faith to proactively bring a claim under the Act and provides for the recovery of damages, costs, fees, and "exemplary damages" and, in some circumstances, the imposition of bonds to ensure the entity has sufficient assets to cover those amounts. These provisions serve the dual purposes of deterring bad faith assertions of patent infringement by covered entities and allowing victims of such bad faith assertions to pursue judicial resolution of the claim with the assurance that, if the claim under the Act is successful, they will recoup their costs. As the court gives deference to the determinations of the General Assembly regarding the Act's purpose and benefits, the court is satisfied that the Act has both a legitimate purpose and local benefits.

Relying on Yamaha, Landmark contends that the Act unduly burdens interstate commerce because it will have "a substantial 'chilling effect' on the assertion of patent rights in North Carolina." (Doc. 18 at 19.) However, Yamaha is inapposite. In that case, the Fourth Circuit invalidated a law that heavily burdened out-of-state interests by permitting existing in-state motorcycle dealerships to challenge the establishment of new dealerships anywhere else in the state, unbounded by the existing dealership's geographical reach, which created a significant barrier to entry into the market. See 401 F.3d at 571. The

58

statute set a low threshold for what existing dealerships needed to show to trigger a formal evidentiary hearing, and even frivolous protests could take years to resolve. Id. Comparing that statute with dealer protection statutes of other states, the court found that "a manufacturer has no way of avoiding the [statute]'s reach . . . and this makes an attempt to open a new dealership in Virginia more burdensome than anywhere else." Id.

Here, Landmark has alleged no fact approaching those in Yamaha. Landmark's conclusory assertion that the Act will "chill interstate communications" regarding patent licensing is based only on an alleged fear of incurring liability; Landmark provides no facts or any evidence to support this claim. Further, unlike the statute at issue in Yamaha, the Act creates no barrier to enter the North Carolina market; the Act imposes no greater burden on patentholders outside of North Carolina than those within North Carolina and does not provide special protections to in-state victims. It is also no more burdensome than similar statutes enacted in over two dozen other states. See Gardner & Dew, supra, at 410-15; (Doc. 50 at 4).

In light of the Act's purpose and benefits, the court finds that the Act does not unduly burden interstate commerce, and Landmark's dormant Commerce Clause challenge fails. Accordingly, the motion to dismiss on this ground will be denied.

59

**B.  Motion for Expedited, Limited Discovery**

NAPCO moves for expedited, limited discovery of "matters relating to the corporate structure, status, liquidity, and historical assertions of patent infringement by . . . Landmark . . . ." (Doc. 38 at 1.)  NAPCO contends that early discovery is necessary to determine whether additional parties should be joined to the present litigation and whether Landmark should be required to post a bond pursuant to § 75-144.  (Id. at 4-6.)  In response, Landmark argues that (1) NAPCO's possible future decision to file a motion for bond is not sufficient to establish good cause for discovery, (2) NAPCO has failed to show irreparable harm in the absence of early discovery, (3) the discovery requests are overbroad, and (4) the bond provision of § 75-144 is preempted and unconstitutional.[19]  (Doc. 51 at 1-2.)

The Federal Rules of Civil Procedure generally provide no access to discovery until the parties have conducted an initial pretrial conference and established a plan for such discovery. Fed. R. Civ. P. 26(d)(1) (citing Fed. R. Civ. P. 26(f)).  However, "[c]ourts have granted expedited discovery when unusual circumstances exist."  ForceX, Inc. v. Tech. Fusion, LLC, No. 4:11CV88, 2011 WL 2560110, at *4 (E.D. Va. June 27, 2011) (internal

---

[19] Landmark also contends that the request for early discovery is improper while Landmark's motion to dismiss is still pending.  (Doc. 51 at 1.) As the court has denied Landmark's motion to dismiss, this argument is now moot.

quotation marks omitted). Although the federal rules do not set out a specific standard for evaluating expedited discovery requests, a majority of courts, including those within this district, review a request for expedited discovery for "reasonableness or good cause, taking into account the totality of the circumstances." See Allen v. City of Graham, No. 1:20CV997, 2021 WL 2037983, at *6 (M.D.N.C. May 21, 2021) (collecting cases).[20] "Typically, '[t]o determine whether a request [for early discovery] is reasonable, courts look to five factors: (1) whether a motion for preliminary injunction is pending, (2) the discovery request's breadth, (3) the purpose for requesting expedited discovery, (4) the burden on the defendant to comply with the requested discovery, and (5) how far in advance of the typical discovery process the request is made.'" Id. (quoting Garnett v. Zeilinger, No. 17CV1757, 2017 WL 8944640, at *1 n.1 (D.D.C. Dec. 15, 2017)) (alterations in original). Courts applying this test also look to whether the moving party would suffer irreparable harm in the absence of early discovery. See, e.g., Lewis v. Alamance Cnty. Dep't of Soc. Servs., No. 1:15CV298, 2015 WL 2124211, at *2 (M.D.N.C. May 6, 2015); Merz N. Am., Inc. v. Viveve Med. Inc., No. 2:17-CV-15-BR, 2017 WL 11613694, at *2 (E.D.N.C.

---

[20] While some courts apply a test similar to the test for a preliminary injunction, that approach "has been criticized." Allen, 2021 WL 2037983, at *6. The parties agree that the good cause or reasonableness standard should be applied here. (See Doc. 38 at 3-4; Doc. 51 at 2-3.)

May 5, 2017); <u>Teamworks Innovations, Inc. v. Starbucks Corp.</u>, No. 1:19CV1240, 2020 WL 406360, at *3 (M.D.N.C. Jan. 24, 2020).

Here, NAPCO argues that early discovery is warranted to determine whether any additional parties should be joined to the present action and whether Landmark should be required to post a bond pursuant to § 75-144. However, NAPCO fails to demonstrate any harm, let alone irreparable harm, that it will incur should early discovery not be granted. In the absence of such showing, the court cannot conclude that there is good cause for early discovery. Accordingly, NAPCO's motion for early expedited, limited discovery will be denied.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Defendant's motion to dismiss (Doc. 17) is DENIED and Plaintiff's motion for expedited discovery (Doc. 37) is DENIED.

/s/   Thomas D. Schroeder
United States District Judge

August 19, 2021